**David Daada GONAHASA, Petitioner,**

v.

**U.S. IMMIGRATION & NATURALIZA-TION SERVICE, Respondent.**

**No. 98–1555.**

United States Court of Appeals,
Fourth Circuit.

Argued March 4, 1999.

Decided May 14, 1999.

**ARGUED:** Ronald Darwin Richey, Rockville, Maryland, for Petitioner. Alice E. Loughran, Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C., for Respondent. **ON BRIEF:** Frank W. Hunger, Assistant Attorney General, Mark C. Walters, Assistant Director, Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C., for Respondent.

Before WILKINSON, Chief Judge, BROADWATER, United States District Judge for the Northern District of West Virginia, sitting by designation, and MICHAEL, Senior United States District Judge for the Western District of Virginia, sitting by designation.

Affirmed by published opinion. Chief Judge WILKINSON wrote the opinion, in which Judge BROADWATER and Senior Judge MICHAEL joined.

## OPINION

WILKINSON, Chief Judge:

David Daada Gonahasa fled his homeland of Uganda after he was detained and threatened for his involvement in an oppo-

sition political party. After being charged with deportability by the Immigration and Naturalization Service (INS), he applied for asylum. The Board of Immigration State Department report, the Board found that conditions in Uganda had changed to such an extent that Gonahasa no longer had a well-founded fear of future persecution. Recognizing the separation of powers concerns that underlie questions of political asylum, we affirm.

## I.

David Daada Gonahasa is a citizen of Uganda. In 1988 he became a member of Uganda's opposition party. As a committee member of the Democratic Party's mobilizer group, Gonahasa was responsible for recruiting members within the city of Kampala. He helped organize approximately five rallies for the party which were attended by fifty to one hundred participants. In speeches at each rally, he criticized the ruling National Resistance Movement Party (NRM). Some of the rallies were dispersed by riot police.

According to Gonahasa, in March 1992 three men arrested him in his home and detained him at a military intelligence headquarters for two weeks. They told him he was being arrested for his antigovernment campaign. He was stripped, beaten, cut on his arms by bayonets, and confined in a small cell. He was then released and told to learn a lesson from his detainment.

After his release, Gonahasa did not return home. Instead, he lived for a couple of weeks with a friend and then moved to the eastern city of Tororo where he lived with distant relatives. Still, Gonahasa returned monthly to Kampala to visit his wife and his two children.

Gonahasa testified that he decided to leave Uganda in October 1992 after he learned government officials visited his home, roughed up his wife, and threatened to kill him. Gonahasa then received a temporary business visa from the United

States Embassy in Kampala. In January 1993 he traveled to the United States.

On August 21, 1995, the INS charged Gonahasa with deportability for remaining in the United States illegally after his visa expired. Gonahasa conceded deportability and requested asylum and the withholding of deportation, or alternatively the privilege of voluntary departure.

Gonahasa appeared before an immigration judge in January 1997. In support of his asylum application, Gonahasa offered his testimony, affidavits from colleagues in Uganda, and background material authored by Amnesty International. The judge also admitted into evidence a Department of State profile of Uganda. *See* 8 C.F.R. § 208.11(c).

At the close of the hearing, the immigration judge issued an oral decision. He found that the evidence failed to demonstrate that Gonahasa suffered past persecution in Uganda, and that in any event country conditions had changed such that Gonahasa did not have a well-founded fear of future persecution. The immigration judge then found Gonahasa deportable, denied his application for asylum, and granted him the privilege of voluntary departure.

Gonahasa appealed the decision to the Board of Immigration Appeals (BIA). The BIA disagreed in part with the immigration judge and found that the evidence demonstrated that Gonahasa had been persecuted. Nonetheless, the Board found that conditions in Uganda had changed since 1992 to the extent that Gonahasa no longer reasonably feared future persecution if he returned. The Board concluded that Gonahasa did not demonstrate eligibility for asylum and withholding of deportation. It granted him thirty days to voluntarily depart the United States. Gonahasa appeals.

## II.

Gonahasa seeks review of the Board's judgment that he is ineligible for political

asylum. Section 208(b) of the Immigration and Nationality Act (INA) delegates discretion to the Attorney General to grant asylum to any alien who is a "refugee." 8 U.S.C. § 1158(b); *see also INS v. Cardoza–Fonseca*, 480 U.S. 421, 428 n. 5, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). As defined by the Act, a refugee is an alien unable or unwilling to return to his home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." INA § 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A). The applicant bears the burden of demonstrating eligibility for asylum. 8 C.F.R. § 208.13(a); *Cruz–Diaz v. INS*, 86 F.3d 330 (4th Cir.1996).

Judicial review of BIA asylum eligibility determinations is narrow. In *M.A. v. INS*, we set forth the rationale for limited judicial involvement:

> [T]o accept the claim of someone to qualify for refugee status is publicly to accuse some other state of engaging in persecution....

> The federal courts lack the expertise, and, more importantly, the constitutional authority, to assume such a role. Numerous Supreme Court decisions recognize the intimate connection between immigration decisions and foreign policy, and, based on separation of powers principles, reject a significant role for the courts in these political matters.

899 F.2d 304, 313 (4th Cir.1990) (en banc) (internal quotation marks omitted).

▪▪▪ Thus, appellate courts employ the deferential standard of substantial evidence. A BIA determination of ineligibility for asylum will be upheld "if supported by reasonable, substantial, and probative evidence on the record considered as a whole." 8 U.S.C.A. § 1105a(a)(4)(1996).[1] "[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 620, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966). Indeed, the Board's determination that an alien is not eligible for asylum must be upheld unless the alien shows that the evidence presented was "so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." *INS v. Elias–Zacarias*, 502 U.S. 478, 483–84, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992).

### III.

▪▪▪ Gonahasa attempts to sail against these strong winds of deference. He first claims that the BIA erred by finding that he does not have a well-founded fear of persecution if he returned to Uganda. To be eligible for asylum on this basis, Gonahasa must show that a reasonable person in a similar situation would fear persecution on account of his political beliefs. *Cruz–Diaz*, 86 F.3d at 331. An applicant's fear of returning "must have some basis in the reality of the circumstances; mere irrational apprehension is insufficient." *M.A.*, 899 F.2d at 311 (internal quotation marks omitted).

Immigration regulations governing asylum eligibility provide that when an alien has suffered past persecution, he is presumed to have the required "well-founded fear of persecution." 8 C.F.R. § 208.13(b)(1)(i). That presumption is subject to rebuttal if the INS can show, by a preponderance of the evidence, that conditions "have changed to such an extent that the applicant no longer has a well-founded fear of being persecuted if he

---

1. Although repealed by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), section 1105a still applies because Gonahasa was in deportation proceedings prior to April 1, 1997; thus his case is governed by IIRIRA's transitional rules. *See* Pub.L. 104–208, §§ 306(b), 309(c),

110 Stat. 3009–546, 3009–612, 3009–625. Decisions in proceedings that began on or after April 1, 1997, will be reviewed under a standard at least as deferential as the substantial evidence standard we apply today. *See* INA § 242(b)(4), 8 U.S.C. § 1252(b)(4).

or she were to return." *Id.; see also Aguilar–Solis v. INS,* 168 F.3d 565, 572 (1st Cir.1999) ("Changed country conditions often speak volumes about the objective reasonableness of an alien's fear that persecution lurks should he return to his homeland."); *Marcu v. INS,* 147 F.3d 1078, 1081 (9th Cir.1998) (discussing the operation of the presumption). Permitting rebuttal simply reflects a recognition that a nation's human rights record can improve.

■ Gonahasa contends that the BIA erred when it concluded that conditions in Uganda have improved sufficiently to permit him to return. Gonahasa argues that reports by the State Department and Amnesty International in 1995 and 1996 noted instances of human rights violations. To the extent that the State Department report indicates improvement, Gonahasa argues that the report misleadingly overstates progress in Uganda for political reasons. Gonahasa thus asserts that substantial evidence does not support the finding that conditions in Uganda have changed.[2]

We disagree. The BIA concluded that a reasonable person would not fear persecution in Uganda in light of the political changes since Gonahasa left his home country. We hold that substantial evidence supported that judgment.

■ The main piece of evidence supporting the BIA's judgment is a July 1996 State Department report entitled "Uganda—Profile of Asylum Claims and Country Conditions." A State Department report on country conditions is highly probative evidence in a well-founded fear case. *See, e.g., Mitev v. INS,* 67 F.3d 1325, 1332 (7th Cir.1995) (giving "great weight to [State Department] opinions on matters within its

area of expertise"); *Kazlauskas v. INS,* 46 F.3d 902, 906 (9th Cir.1995) (describing state department reports as " 'the most appropriate and perhaps the best resource' for 'information on political situations in foreign nations' " (quoting *Rojas v. INS,* 937 F.2d 186, 190 n. 1 (5th Cir.1991))). Reliance upon these reports "makes sense because this inquiry is directly within the expertise of the Department of State." *Marcu,* 147 F.3d at 1081.

It is true that State Department reports may be flawed and that private groups or news organizations often voice conflicting views. Those conflicting reports, for all their insights, may have drawbacks of their own. *See M.A.,* 899 F.2d at 313 ("Although we do not wish to disparage the work of private investigative bodies in exposing inhumane practices, these organizations may have their own agendas and concerns, and their condemnations are virtually omni present."); *Vaduva v. INS,* 131 F.3d 689, 691 (7th Cir.1997) ("If it is reasonable to suspect the State Department has a tendency to soft-pedal human rights violations, it may be just as reasonable to suspect that Amnesty International exaggerates them so they will not go without notice." (citation omitted)).

■ In any event, our task is not to reweigh the evidence and determine which of the competing views is more compelling. It is instead to ensure that substantial evidence supports the BIA's judgment. In most cases, a State Department report provides such substantial evidence. Absent powerful contradictory evidence, the existence of a State Department report supporting the BIA's judgment will generally suffice to uphold the Board's decision. Any other rule would invite courts to over-

---

2. Gonahasa also contends that the BIA erred by failing to consider an affidavit from his wife which was not presented initially to the immigration judge. Even assuming there was error, it was harmless. *See Farrokhi v. INS,* 900 F.2d 697, 702 (4th Cir.1990). The affidavit mainly speaks to an issue Gonahasa pre-

vailed upon below: the suffering of past persecution. The affidavit does note that the mail of Gonahasa's family is still being read by the government, but that alone does not cast into doubt the substantiality of the evidence supporting the BIA's judgment.

turn the foreign affairs assessments of the executive branch.

In this case, the State Department report constituted more than substantial evidence for the BIA's judgment. That report detailed Uganda's human rights progress since Gonahasa left the country. Notably, the report indicated an increased tolerance for public expression of opposing political viewpoints. It took notice of the president of Uganda's "overt advocacy of human rights and toleration of a relatively free press." Specifically, the report stated that the government has acquitted and dropped all charges of treason, pardoned former rebels, established a human rights desk in the Ministry of Justice, rooted out police and military corruption, and set up judicial tribunals in outlying areas.

The report noted that as a result of these efforts, especially the amnesty program for rebels, a "number of prominent Ugandans continued to return from exile in 1993 and 1994." It also stated that political "parties do participate in open debate in the press and in many public forums. Public figures and opposition leaders criticize government policies, corruption, and human rights abuses, and several major opposition parties publish newspapers or other periodicals to promote their views." The report also noted that, operating under a new constitution, Uganda held its first presidential election in 1996.

The report concluded that although many Ugandan asylum applicants fear for their safety because of past opposition to the government, "with increased—albeit circumscribed—political activity and more government tolerance of criticism in the press and elsewhere, many of those fears appear to be based on situations from the past." In closing, the report stated that "despite some claims by applicants to the contrary, membership and even leadership roles in one of the opposition political parties or movements does not mean that that person is in danger in Uganda today."

■ Even some of the evidence introduced by Gonahasa corroborated the State Department's findings. A 1995 Amnesty International report noted that "There have been important improvements in the human rights situation [in Uganda] since 1992." Additionally, Gonahasa submitted an affidavit from a fellow human rights activist in the Democratic Party. Despite being involved in an opposition party, the affiant declared that he was employed by the government as a Higher Executive Officer in the Ministry of Justice prior to his retirement in 1995. His experience is not unique—other members of the Democratic Party have obtained government positions in the Ministries of Justice and Foreign Affairs. In light of this evidence and the detailed State Department report, we hold that substantial evidence supports the BIA's judgment that Gonahasa lacked a well-founded fear of persecution.[3]

### IV.

Gonahasa also argues that even in the absence of a well-founded fear of future persecution, the severity of his persecution alone makes him eligible for asylum. 8 C.F.R. § 208.13(b)(1)(ii) (permitting the Attorney General to grant asylum if the applicant "demonstrated compelling reasons for being unwilling to return . . . arising out of the severity of the past persecu-

---

**3.** Gonahasa's request for asylum in deportation proceedings is also considered to be a request for withholding of deportation. 8 C.F.R. § 208.3(b); *see also INS v. Stevic,* 467 U.S. 407, 420 n. 13, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984). To establish entitlement to withholding of deportation under section 243(h) of the INA, 8 U.S.C.A. § 1253(h) (1996), an alien must demonstrate "it is more likely than not that the alien would be subject to persecution." *Stevic,* 467 U.S. at 429–30, 104 S.Ct. 2489; *see also* 8 C.F.R. § 208.16(b)(3)(ii). Because we hold that Gonahasa has failed to demonstrate his eligibility for asylum based on fear of persecution, he also has failed to meet the greater burden for the withholding of deportation. *Huaman–Cornelio v. BIA,* 979 F.2d 995, 1000–01 (4th Cir.1992); *see also Aguilar–Solis,* 168 F.3d at 569 n. 3.

tion."); *see also Matter of Chen,* 20 I. & N. Dec. 16, 1989 WL 331860 (BIA 1989).

 We disagree. To begin with, Gonahasa failed to raise this claim in either the proceedings before the immigration judge or his appeal to the BIA. Generally, an alien's failure to raise an issue before the BIA constitutes a waiver of the issue and precludes review by this court. *Farrokhi v. INS,* 900 F.2d 697, 700 (4th Cir.1990); *see also Henry v. INS,* 8 F.3d 426, 439 n. 19 (7th Cir.1993).

 Even if we were to reach this ground, Gonahasa's persecution in Uganda—while deplorable—is simply not severe enough to warrant asylum. His is not "the rare case where past persecution is so severe that it would be inhumane to return the alien even in the absence of any risk of future persecution." *Vaduva,* 131 F.3d at 690. Eligibility for asylum based on severity of persecution alone is reserved for the most atrocious abuse. *Bucur v. INS,* 109 F.3d 399, 405 (7th Cir.1997) (noting that 8 C.F.R. § 208.13(b)(1)(ii) was "designed for the case of the German Jews, the victims of the Chinese 'Cultural Revolution,' survivors of the Cambodian genocide, and a few other such extreme cases." (citation omitted)). Thus, Gonahasa's claim to asylum would have been denied even had he raised it below. *See id.* at 405–06 (dismissing BIA's failure to consider severity of persecution as harmless error).

## V.

For the foregoing reasons, the judgment of the BIA is hereby

*AFFIRMED.*