or political opinion." 8 U.S.C. § 1253(h) (1996). An application seeking withholding of deportation faces a more stringent burden of proof than one for asylum. *Cardoza-Fonseca*, 480 U.S. at 431-32. In order to qualify for withholding of deportation, Koliada must demonstrate that there is a clear probability that he would be subject to persecution if he were to return to the Ukraine. *See Ivezaj v. INS*, 84 F.3d 215, 221 (6th Cir. 1996). Because substantial evidence supports the Board's determination that Koliada is ineligible for asylum, it therefore follows that he cannot satisfy the more stringent standard for withholding of deportation.

### III.

For the foregoing reasons, we AFFIRM the decision of the Board of Immigration Appeals and DENY Koliada's petition for review.

---

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0249P (6th Cir.)
File Name: 01a0249p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

YOURI K. KOLIADA,
                    *Petitioner,*

v.                                              No. 00-3421

IMMIGRATION AND
NATURALIZATION SERVICE,
                    *Respondent.*

On Petition for Review of an Order of the Board of
Immigration Appeals.
No. A74 699 712.

Submitted: June 12, 2001

Decided and Filed: August 1, 2001

Before: MARTIN, Chief Judge; NORRIS, Circuit Judge;
QUIST, District Judge.

---

*The Honorable Gordon J. Quist, United States District Judge for the Western District of Michigan, sitting by designation.

————————

**COUNSEL**

**ON BRIEF:** Charles H. Kuck, LITTLER MENDELSON, Atlanta, Georgia, for Petitioner. Kristen A. Giuffreda, UNITED STATES DEPARTMENT OF JUSTICE, IMMIGRATION LITIGATION, CIVIL DIVISION, Washington, D.C., Anh-Thu P. Mai, UNITED STATES DEPARTMENT OF JUSTICE, OFFICE OF LITIGATION, CIVIL DIVISION,Washington, D.C., for Respondent.

————————

**OPINION**

————————

PER CURIAM. Youri K. Koliada, a native and citizen of the Ukraine, requested asylum and withholding of removal from the United States, which an administrative immigration judge denied on February 26, 1997. The Board of Immigration Appeals affirmed this denial on March 9, 2000. Koliada now petitions for review of the Board's decision, arguing that his well-founded fear of persecution merits reversal. For the following reasons, we AFFIRM the Board's decision and DENY Koliada's petition for review.

I.

A. Facts Regarding Koliada

Mr. Koliada grew up in a family with an anti-communist history and convictions.[1] His grandfather was a wealthy landowner who was abducted by communists in 1937, never to return. Koliada's wife's grandfather was exiled to Siberia for seventeen years. When Koliada was a child, communist

————————

[1]Unless noted otherwise, the source for the following account is a personal statement from Koliada. The immigration judge explicitly found this account to be credible.

to live peacefully in the Ukraine and that his wife continues to be a public school teacher in that country. Their fear of crime in the Ukraine and Koliada's fears of economic and environmental problems are legitimate but are not relevant to his fear of future political persecution.

In order to reverse the immigration judge's determination on this issue, which the Board adopted, we must decide that the evidence would compel a reasonable factfinder to conclude that there is a reasonable chance of Koliada suffering future persecution if he were to return to the Ukraine. 8 C.F.R. § 208.13(b)(2) (2001). *See also Mikhailevitch*, 146 F.3d at 390 (affirming the Board's denial of asylum where the petitioner entered the United States in 1991 and conditions in Belarus were sufficiently improved by 1998 that finding a reasonable possibility of future persecution was no longer compelled); *Perkovic*, 33 F.3d at 617 (reversing the Board's denial of asylum where the petitioners entered the United States in 1986, had participated extensively in ethnic Albanian emigre groups, and a State Department letter stated that "membership in groups considered by Yugoslav authorities to be hostile to Yugoslavia has been grounds for prosecution of individuals in Yugoslavia."). Under these circumstances, we hold that the evidence does not compel such a conclusion. Because the Board determined that Koliada does not qualify as a "refugee" as defined in 8 U.S.C. § 1101(a)(42)(A) and substantial evidence supports that determination, we need not answer whether Koliada merits a favorable exercise of discretion with respect to his application for asylum. *See Mikhailevitch*, 146 F.3d at 390.

E.

The United States Code in effect at the time of Koliada's deportation hearing provided that "[t]he Attorney General shall not deport or return any alien . . . to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group,

impeccable source" for information in political conditions in foreign countries).

But these profiles and reports have been attacked, sometimes even by the same opinions that have praised them. *See Gonahasa*, 181 F.3d at 542 ("It is true that State Department reports may be flawed and that private groups or news organizations often voice conflicting views."); *Gailius*, 147 F.3d at 46 (noting that the State Department's advice is not binding); *Gramatikov v. INS*, 128 F.3d 619, 620 (7th Cir. 1997) ("There is perennial concern that the Department softpedals human rights violations by other countries that the United States wants to have good relations with."). Also, the State Department's Office of Asylum Affairs produced the profile in this case specifically for the Service, not for the State Department's own diplomatic business. It stands to reason that a report produced by one executive department to aid the litigation of another executive department would often support the second department's point of view. Regardless, the standard of review dictates much of the inquiry here, which is to decide whether substantial evidence supports the Board's decision.

The immigration judge found it significant that the political group Koliada supported in 1991 is now in charge of the government in the Ukraine. In 1994, President Leonid Kuchma was elected by popular vote in what the State Department believes was a fair election. The profile noted that the Ukraine has "seen the emergence of a multi-party system reflecting a broad range of political viewpoints" in the post-independence period. Although the Security Service of Ukraine, the reincarnation of the KGB in that country, probably harbors some individuals who would not tolerate political dissent, the State Department profile suggests that those people present no real threat of mistreatment to those who supported Ukrainian independence in the past.

Also, the Ukraine issued Koliada a passport in 1992 and allowed him to come to the United States three years later without difficulty. Koliada testified that his mother continues

militia interrogated his family about his father's activities and searched for anti-communist literature in his home. His father, who did not participate in biannual mandatory rallies for the communist party, was arrested and exiled to Siberia for two years beginning in 1956.

Koliada experienced personal intimidation by government authorities as well. In 1976, he was singled out by militia members for attending Easter church services and told that doing so jeopardized his chances of going to college. Koliada was also threatened with expulsion from college in 1977 for failing to attend a communist rally. While serving a three-month stint in the Soviet Army that was a prerequisite to graduation, he tried to keep his commanding officer from beating a friend in his unit. The commander sent him to military prison for seven days of labor. After completing his education in 1981, he began working as an engineer with a government business in Poltava. Soon after, the KGB began checking up on Koliada and questioning his friends, who were renowned anti-communists. Soviet authorities had persecuted two of his friends for their political beliefs.

Although he was never imprisoned, the communist militia took him into custody several times because of his political views. In 1985 the militia put him under house arrest for three months with orders not to leave his house from 10:00 p.m. until 5:00 a.m. No explanation accompanied the order. The militia disconnected Koliada's telephone at this point as well.

In 1988, Koliada joined the Ukrainian Social Group in a hunger strike to protest politically motivated arrests of some group members. The militia arrested Koliada and searched his house on July 15. While interrogating Koliada, the militia showed him photographs of him with his friends and threatened to kill his family. Although he denied membership in the Group, he affirmed his support for its cause: Ukrainian independence from the Soviet Union. The interrogating officer then punched Koliada repeatedly in the stomach.

Koliada began attending the meetings of various anti-communist groups in late 1989. Because these groups were illegal under Soviet law, militia officers arrested him and others who attended the meetings and released them after they paid fines.

The Ukrainian parliament passed a declaration of sovereignty in July 1990, and in August declared Ukraine independent of the Soviet Union. The Ukraine became a charter member of the Commonwealth of Independent States with the ratification of the Belovzhskoe Agreement in December. Leonid Kravchuk, a former Communist turned nationalist, became Ukraine's first president. Koliada continued his anti-communist activities.

Two militia officers took Koliada to a local militia station in March 1992 and told him that if he continued with his political activities his family would be killed. These officers told Koliada that, although the government officials' titles had changed, they were the same people as before and would enforce similar policies. The officers then punched him in the face and released him.

In February 1993, a friend gave Koliada some documents indicating proof of government-owned businesses' payments to organized criminals. On March 8, militia officers arrested him and interrogated him about these documents. When Koliada denied knowledge of the papers, one of the officers punched him in the abdomen until he lost consciousness. When he returned to his apartment, he found that it had been ransacked and the documents were missing.

Two years after this final encounter with the Ukrainian militia, a pen pal invited him to visit Cleveland, Tennessee. Koliada entered the United States on March 24, 1995, as a nonimmigrant visitor with authorization to remain until March 22, 1996.

founded fear of persecution. 8 C.F.R. § 208.13(b)(1)(i) (2001).[2] The Service may rebut that presumption only by establishing through a preponderance of the evidence that since the persecution occurred conditions in the applicant's country "have changed to such an extent that the applicant no longer has a well-founded fear of being persecuted were he to return." *Id.*

The immigration judge accepted the Service's stipulation that Koliada had suffered past persecution in the Ukraine. Koliada contends that the punishment received at the hands of the Ukrainian militia compels a conclusion that he would be persecuted upon returning to that country. However, the judge found, and the Board agreed, that the Service had carried its burden of establishing that conditions in the Ukraine had changed enough that Koliada's return would cause him no well-founded fear of persecution.

In making this determination, the judge considered the statements Koliada set forth in his application, his testimony at the hearing, and the State Department's Ukraine Profile, among other pieces of evidence. Other circuits have held that State Department reports on other countries are entitled to significant deference when assessing conditions there. *See Gonahasa v. INS*, 181 F.3d 538, 542 (4th Cir. 1999) (describing these reports as "highly probative evidence in a well-founded fear case); *Marcu v. INS*, 147 F.3d 1078, 1081 (9th Cir. 1998) (noting that reliance on these reports "makes sense because this inquiry is directly within the expertise of the Department of State"); *Gailius v. INS*, 147 F.3d 34, 46 (1st Cir. 1998) (noting that State Department opinions "receive considerable weight in the courts because of the . . . Department's expertise"); *Rojas v. INS*, 937 F.2d 186, 190 n.1 (5th Cir. 1991) (calling the State Department a "relatively

---

[2]An applicant may also establish a well-founded fear of persecution without reference to past persecution by demonstrating the elements outlined in 8 C.F.R. § 208.13(b)(2)(i), though this method does not bear on Koliada's case.

considered as a whole.'" *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992) (quoting 8 U.S.C. § 1105a(a)(4)). Under this deferential standard, we may not reverse the Board's determination simply because we would have decided the matter differently. *Mikhailevitch v. INS*, 146 F.3d 384, 388 (6th Cir. 1998); *Klawitter v. INS*, 970 F.2d 149, 151-52 (6th Cir. 1992). In order to reverse the Board's factual determinations, we must find that the evidence "not only supports a contrary conclusion, but indeed *compels* it." *Klawitter*, 970 F.2d at 152. The Supreme Court has explained that the appropriate inquiry is whether the evidence "was such that a reasonable factfinder would have to conclude that the requisite fear of persecution existed." *Elias-Zacarias*, 502 U.S. at 481.

### D. Asylum

The Attorney General has discretion under the Immigration and Nationality Act to grant asylum to a "refugee." 8 U.S.C. 1158(a) (2001). The Act defines a refugee as an alien who is unable or unwilling to return to his home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A) (2001). Disposition of an application for asylum requires a two-step inquiry, asking: (1) whether the applicant qualifies as a "refugee" as defined in Section 1101(a)(42)(A), and (2) whether the applicant "merits a favorable exercise of discretion by the Attorney General." *Mikhailevitch*, 146 F.3d at 389 (quoting *Perkovic v. INS*, 33 F.3d 615, 620 (6th Cir. 1994)).

An applicant for asylum bears the burden of establishing that he qualifies as a refugee "either because he has suffered actual past persecution or because he has a well-founded fear of future persecution." 8 C.F.R. § 208.13(a)-(b) (2001). The applicant's testimony, if credible, "may be sufficient to sustain the burden of proof without corroboration." 8 C.F.R. § 208.13(a) (2001). An applicant who satisfies his burden of establishing past persecution is presumed to have a well-

### B. Other Testimony

Jimmy Williams Burns, a music professor at Lee College in Cleveland, Tennessee, testified on Koliada's behalf at his hearing based on Burns's visits to the Ukraine and his continued contact with teachers at a school in Poltava, Ukraine. He stated that a teacher-and student-exchange program had allowed him to visit and work in the Ukraine for six weeks in 1993 and again in 1994. Burns also testified that he believed Koliada might be subject to intimidation if he were to return to Poltava, perhaps more so than in more cosmopolitan cities such as Odessa or Kiev.

### C. The State Department's Assessment of the Ukraine

The immigration judge admitted the U.S. State Department's June 1996 Ukraine Profile of Asylum Claims and Country Conditions into evidence. The Ukraine profile indicates in its overview that the Ukraine continued to make progress in the observation of human rights. "Reports of human rights violations, already low, decreased [between 1994 and 1996]," the profile reads. "Government restrictions on freedom of religion and cultural expression have been largely lifted, and the Communist Party, whose heavy hand and totalitarian ideology were pervasive in Ukrainian life, no longer rules the country." The profile notes, however, that problems remain, including beatings by police and prison officials, unreformed legal and prison systems, discrimination against women, societal anti-Semitism, and ethnic tensions between Russians and Tatars in the Crimea. The State Department profile also recognizes that the personnel of the former KGB, now nationalized and renamed the Security Service of Ukraine, has changed little since 1991 and may still not tolerate political dissent. Still, the profile says these individuals present no real threat of mistreatment to those who supported Ukrainian independence at some time in the past.

The State Department noted that as Ukrainian leaders reluctantly accepted elements of Mikhail Gorbachev's liberalization of the Soviet Union in the late 1980s, some who

were determined to resist change became more forceful in their determination to preserve the status quo. Still, "[t]he post-independence period has seen the emergence of a multi-party system reflecting a broad range of political viewpoints." Parliamentary elections in 1994 were apparently conducted fairly, and "[t]here is no evidence that rank and file members [of different political parties] are being targeted because of their political views." The State Department attributes the high rate of migration from the Ukraine to a depressed economy and damaged ecology rather than to politics.

## D. Procedure

Koliada's permission to remain in the United States expired on March 22, 1996, and on April 27 the Immigration and Naturalization Service ordered him to show cause why he should not be deported. Koliada then filed an application for asylum and withholding of deportation and, in the alternative, voluntary departure, which the Service received on November 7. On February 26, 1997, after a hearing on the merits of his application, the immigration judge denied Koliada's application for asylum and withholding of deportation. The judge did not order immediate deportation, but granted Koliada's motion for voluntary departure, to occur no later than August 26. Koliada appealed the denial of his application for asylum and withholding of deportation to the Board of Immigration Appeals, which affirmed the immigration judge on March 9, 2000. Koliada filed a timely petition for review by this Court on April 6.

## II.

### A. Jurisdiction

The Board of Immigration Appeals had jurisdiction over Koliada's appeal from the immigration judge's decision pursuant to 8 C.F.R. § 3.1(b)(2) (1999). Prior to passage of the Immigration Reform and Immigrant Responsibility Act (the Reform Act), those who wished to appeal any decision of the Board would file a petition for review in the Court of Appeals for the appropriate circuit. *See* 8 U.S.C. § 1105a

(1995). The effective date for the new jurisdictional provisions of the Reform Act was "the first day of the first month beginning more than 180 days" after the Reform Act's enactment, which happened on September 30, 1996. Therefore, the effective date for the relevant Reform Act provisions was April 1, 1997.

A deportation order becomes final "upon dismissal of an appeal by the Board of Immigration Appeals," among other ways. 8 C.F.R. § 241.31 (2001). As to cases in which a final deportation order was filed after October 30, 1996, and which were pending before April 1, 1997, the Reform Act's transitional rules apply. The Reform Act's permanent provisions pertain to removal proceedings initiated by the Service on or after April 1, 1997. *Kalaw v. INS*, 133 F.3d 1147, 1150-51 (9th Cir. 1997).

The Board issued a "final order" in this case by dismissing Koliada's appeal on March 9, 2000, well outside the transition window between October 30, 1996, and April 1, 1997. Therefore, we have jurisdiction over Koliada's appeal from the Board's decision under the Reform Act's permanent jurisdictional provisions. *See* 8 U.S.C. § 1252(a)(1) (Supp. 1997) (referring to 28 U.S.C. § 2347).

### B. The Board's Decision

In affirming the immigration judge's denial of Koliada's application, the Board held that the judge "correctly found the respondent failed to establish either a well-founded fear of persecution or a clear probability of persecution, and that a reasonable person in the respondent's circumstances would not fear persecution."

### C. Standard of Review

We must decide whether the Board correctly determined that Koliada failed to sustain his burden of establishing eligibility for asylum and withholding of deportation. The Board's determination "must be upheld if 'supported by reasonable, substantial, and probative evidence on the record