[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
September 20, 2005
THOMAS K. KAHN
CLERK

_____

No. 05-10091
Non-Argument Calendar

_____

Agency Nos. A75-352-244, A75-352-245

VERA PROTSENKO,
JURI PROTSENKO,

Petitioners,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(September 20, 2005)

Before BIRCH, CARNES and MARCUS, Circuit Judges.

PER CURIAM:

Vera and Juri Protsenko, proceeding pro se, petition for review of the Board of Immigration Appeals's ("BIA") adoption and affirmation of the Immigration Judge's ("IJ") order denying asylum and withholding of removal under the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1158 and 1231(b)(3), and the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment ("CAT"), 8 C.F.R. § 208.16(c). We

**AFFIRM**. **I. BACKGROUND**

The petitioners, a married couple of Russian ethnicity who lived in Estonia for most of their lives, were admitted into the United States in April 1997 as nonimmigrant visitors. They were given authorization to remain in the United States until 30 September 1997. On 14 March 2001, the petitioners were issued a notice to appear ("NTA") before an IJ by the Immigration and Naturalization Service ("INS")[1] which alleged that they were citizens and natives of Russia and charged them with removability.

At their preliminary hearing before the IJ, the petitioners, through counsel, conceded removability and admitted to the charges set forth in their NTAs, with the exception that they denied Russian citizenship. They asserted that they were

---

[1] On 25 November 2002, the Homeland Security Act of 2002 ("HSA"), Pub. L. No. 107-296, 116 Stat. 2135, was signed into law. The HSA abolished the INS and transferred its functions to the newly created Department of Homeland Security ("DHS"). Because this case was initiated while the INS was still in existence, however, this opinion will reference the INS rather than the DHS.

2

born in the Soviet Union at a time when Russia was not an independent country and thereafter lived in Estonia for many years. After the collapse of the Soviet Union, the petitioners alleged that their applications for Estonian citizenship were denied because the father of Vera Protsenko was part of the former Soviet Union military. The temporary travel documents issued to them by the Estonian government indicated their country of citizenship as "XXX." AR at 70. At the conclusion of the hearing, the IJ found the petitioners removable, but reserved ruling on the issue of the petitioners' citizenship until a subsequent hearing. Finally, the IJ asked petitioners whether they wanted to designate a country of removability, to which they responded negatively.

Subsequently, petitioners submitted an application for asylum and withholding of removal based on the persecution they suffered in Estonia on account of their religion, nationality, and membership in a particular social group. To support her claims of persecution, Vera Protsenko alleged, inter alia, that: (1) she had been persecuted for her Christian Orthodox faith, a prominent faith among ethnic Russians, by the Estonian government which refused to recognize the Christian Orthodox religion; (2) Estonian law denominated her a foreigner because she was of Russian nationality and hindered her from attaining Estonian citizenship; (3) she had been fired from her job as a teacher based on her lack of Estonian citizenship; (4) she and her family had been the victims of hate crimes as

3

anti-Russian Estonians burglarized their home twice, and sprayed red stars on their home in one such incident; and (5) on 23 January 1997, the Kaitselit, an anti-Russian paramilitary group, beat Juri because of his status as a former Soviet military officer. In support of these claims, the petitioners submitted various documentation, including: hospital records which indicated that Juri was treated at a hospital for injuries after the January 1997 incident; a certificate from the Estonian government denying Vera Estonian citizenship and permanent residency; certificates from the Russian embassy which indicated there was no record petitioners were citizens of Russia; Juri's former military identification card; a certificate from Vera's employer which indicated she was terminated from her teaching position due to a "lack of pedagogical education," AR 208, and various newspaper articles which documented discrimination of ethnic Russians living in Estonia. In response, the government submitted the 2000 United States Department of State Country Reports on Human Rights Practices for Estonia and Russia. The Country Report for Estonia noted that former Soviet military officers and their families are often precluded from obtaining Estonian citizenship. Estonian naturalization laws were, however, in line with international standards, according to the report. Moreover, although ethnic Russians often complained of discriminatory treatment in the workplace and in living conditions, the Estonian Country report stated that foreign government officials monitoring the situation in

4

Estonia found no such pattern of human rights violations. The Russian Country Report indicated that immigrants with a legal claim to Russian citizenship often have difficulty emigrating to Russia from former Soviet republics and obtaining Russian citizenship.

At the removal hearings, the petitioners provided testimony to buttress their asylum application. Particularly, Vera Protsenko testified that she was stateless because Estonian law had declared that anyone not residing in Estonia before 1940 was a foreigner, and because the Estonian government had denied her applications for citizenship four times. She admitted that she had not applied for Russian citizenship because she had lived in Estonia her entire life and would have difficulty obtaining Russian residency permits and living in Russia without any ties to the area. Vera also testified that she had been a teacher for several years, but was terminated because she lacked the proper education. She stated that this was just an excuse to fire her, however, and that the real reason for her termination was her participation in a teacher's union and her reluctance to support the school administrators' plan to rapidly "Estonianize" the education system in place of the old Russian system. Vera admitted, however, that not all Russian teachers at her school were terminated. In addition, Vera testified that she participated in demonstrations to fight religious and anti-Russian persecution, and that she had been arrested and detained for twenty-four hours during one such demonstration.

Finally, Vera testified that she and her family were targeted by an anti-Russian youth group on two specific occasions. In January 1993, she testified that a group of youth burglarized their home and left anti-communist graffiti on their walls. Although police investigated the burglary, she testified that they did not report or investigate the anti-Russian hate crime aspect of the incident. She testified that the same group burglarized her family's summer residence in 1995, but she did not report the crime because she felt that the police would not have helped her.

The IJ then rendered a decision denying the petitioners' application for asylum, withholding of removal, and CAT protection. Although the IJ found Vera's testimony credible, she also found that the petitioners failed to meet their burden of showing eligibility for asylum or CAT protection. Specifically, the IJ noted that it appeared as though the petitioners had been victimized and suffered isolated incidents of discrimination, but not to the extent necessary to show that they had suffered past persecution. The IJ found that it was not enough that Vera had lost her job, noting that the stated reason for her termination was that Vera did not have a degree in education, which she had admitted was true. With regard to Juri's beating incident, the IJ found that, although it was "reprehensible," it was, at most, an isolated incident resulting from an Estonian "backlash" against the Russian military occupation prior to Estonia gaining its independence. AR at 59-60. The IJ proceeded to note that the petitioners were "not just innocent

6

Russian settlers in the area for Estonia," but, rather both Juri and Vera's father "were members of the military serving what Estonia now sees as the foreign enemy. And now they're basically paying the consequences of that." AR at 60. With regard to Russia being the country of removal, the IJ noted that the petitioners were ethnic Russians and found that it was "unreasonable" for the petitioners to claim that they had no roots or ties to Russia when the same could be said about their decision to apply for asylum in the United States. AR at at 61. The IJ concluded that the petitioners had a "duty to avail themselves of the citizenship and protection of" Russia. AR at 62. In sum, because petitioners had established that they suffered from a "level of discrimination and nothing more," the IJ denied the petitioners' application for asylum and withholding of removal and ordered them removed to the Russian Federation, or alternatively, in the case of Vera, to Estonia. AR at 63.

Petitioners, through counsel, appealed the IJ's decision to the BIA. They argued that the IJ erred because: (1) substantial evidence supported their asylum claims; (2) they were improperly ordered removed to Russia; and (3) the IJ expressed a political bias by suggesting that any anti-Russian discrimination they suffered was deserved after Estonia gained its independence. The BIA affirmed the IJ's decision that petitioners had failed to establish eligibility for asylum and dismissed their claims of error.

7

On appeal, the petitioners make three arguments that the BIA's order should be reversed. First, they argue that substantial evidence does not support the IJ's finding that they failed to demonstrate eligibility for asylum and withholding of removal under the INA. Second, they argue that their due process rights were violated because the IJ did not give them notice they could be removed to Russia and because the IJ's comments betrayed an anti-Russian political bias. We address each argument in turn.

## II. DISCUSSION[2]

A.  Denial of Asylum and Withholding of Removal

"We review only the [BIA's] decision, except to the extent that it expressly adopts the IJ's opinion. Insofar as the [BIA] adopts the IJ's reasoning, we review the IJ's decision as well." Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir. 2001) (citations omitted). Here, because the BIA concurred with the IJ's findings and reasoning, we review both the IJ's and BIA's decisions. We review legal determinations de novo. Mohammed v. Ashcroft, 261 F.3d 1244, 1247 (11th Cir. 2001). The BIA's and IJ's factual determination that an alien is not entitled to withholding of removal must be upheld if it is supported by substantial evidence.

---

[2] Because the petitioner's removal proceedings commenced after 1 April 1997, the effective date of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), this case is governed by the permanent provisions of the INA, as amended by IIRIRA. See Gonzalez-Oropeza v. United States Att'y Gen., 321 F.3d 1331, 1332 (11th Cir. 2003) (per curiam).

Najjar, 257 F.3d at 1283.  To reverse the IJ's decision, a reviewing court must conclude that the record not only supports such a conclusion, but compels it.  INS v. Elias-Zacarias, 502 U.S. 478, 481 n.1, 112 S. Ct. 812, 815 n.1 (1992).

The INA provides the Attorney General with the discretion to grant asylum to an otherwise removable alien.  See 8 U.S.C. § 1158(b)(1)(A).  The Attorney General may exercise such discretion upon finding that the alien is a "refugee."  Id.

> A 'refugee' is 'any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of [past] persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion . . . .'

D-Muhumed v. United States Att'y Gen., 388 F.3d 814, 818 (11th Cir. 2004) (quoting 8 U.S.C. § 1101(a)(42)(A)).  The burden of proof is on the applicant for asylum to establish that he or she is a refugee.  Id.  To establish past persecution, an "extreme concept," the asylum applicant must show "more than a few isolated incidents of verbal harassment or intimidation," Sepulveda v. United States Att'y Gen., 401 F.3d 1226, 1231 (11th Cir. 2005) (per curiam) (internal quotations and citation omitted) (finding one bombing targeted at the asylum applicant and three threatening telephone calls insufficient to establish past persecution).  To establish a "well-founded fear of persecution" to qualify for asylum, the alien must present

9

"specific, detailed facts showing a good reason to fear that he or she will be <u>singled out</u> for persecution on account of [his or her nationality]." <u>Id.</u> (internal quotations omitted). Where an alien has failed to establish eligibility for asylum, the alien likewise has failed to establish eligibility for withholding of removal under the INA or CAT. <u>Nreka v. United States Att'y Gen.</u>, 408 F.3d 1361, 1369 (11th Cir. 2005).

Based on the foregoing precedent, we conclude that the record does not compel a reversal of the BIA's order. With regard to the loss of Vera's job, the record demonstrates that the stated reason for her termination—her lack of an education degree—had a factual basis which Vera admitted. Moreover, she admitted that she was not supportive of the school's plan to change its educational system from the old Russian system and that other ethnic Russian teachers were not fired. Thus, despite her allegations of pretext, the record does not compel a finding contrary to the one reached by the IJ and the BIA. In addition, with regard to the two incidents in which the Protsenkos' home was burglarized and the one incident in which Juri was beaten, the record does not demonstrate that these were more than isolated acts and therefore did not rise to the level of persecution. <u>See Sepulveda</u>, 401 F.3d at 1231. Moreover, in light of the facts that Estonian police investigated the first incident of burglary after being called by the Protsenkos, and that Juri was treated for injuries by an Estonian hospital, the record does not

10

demonstrate that the Estonian government had refused to protect the Protsenkos. Additionally, the fact that Vera was detained after participating in a demonstration does not compel a contrary finding on the issue of past persecution. See Rojas v. United States Att'y Gen., 134 Fed. Appx. 330, 334-35 (11th Cir. 2005) (per curiam) (one incident of short-term government detention along with threatening telephone calls insufficient to constitute past persecution). Accordingly, taking these allegations in the aggregate, we conclude that substantial evidence supported the IJ's and the BIA's determination that the petitioners had not demonstrated past persecution. Likewise, we conclude the petitioners did not sufficiently establish a well-founded fear of future persecution. Although they were allegedly denied citizenship and residency four times, they did not demonstrate that the Estonian government would decline to protect their rights because of their Russian ethnicity. Moreover, the government offered evidence from the Estonian Country Report which indicated that there was no pattern of human rights abuses against ethnic Russians in Estonia, and that programs existed for integrating ethnic Russians into Estonia. See Gonahasa v. INS, 181 F.3d 538, 542 (4th Cir. 1999) ("A State Department report on country conditions is highly probative evidence in a well-founded fear case."). In addition, the IJ noted that Vera's parents and her brother, now an Estonian citizen, still live in Estonia, and yet the record does not reflect that they suffered any persecution. See Tawm v. Ashcroft, 363 F.3d 740,

11

743 (8th Cir. 2004) (finding that an alien did not establish a well-founded fear where, inter alia, the alien's family continued to live in Lebanon without incident). Thus, because the petitioners failed to establish past persecution on account of their ethnicity or a well-founded fear of future persecution, substantial evidence supported the IJ's finding that they were not entitled to asylum. Moreover, because they could not establish eligibility for asylum, the BIA and IJ properly refused petitioners' claims for withholding of removal. Nreka, 408 F.3d at 1369.

B. Due Process Violations

We review de novo an asylum applicant's claim that due process rights were violated during removal proceedings. Lonyem v. United States Att'y Gen., 352 F.3d 1338, 1341 (11th Cir. 2003) (per curiam). To prevail on a due process challenge to the sufficiency of removal proceedings, an alien must show that the due process violation caused substantial prejudice, which typically requires a showing that the outcome would have differed had the due process violation not occurred. See Ibrahim v. INS, 821 F.2d 1547, 1550 (11th Cir. 1987). Here, the Protsenkos argue that their due process rights were violated because they were not given notice that they could be removed to Russia and because of the IJ's alleged anti-Russian bias.

1. Notice of Removal to Russia

Aliens are entitled to the Fifth Amendment's due process rights during deportation proceedings. Reno v. Flores, 507 U.S. 292, 306, 113 S. Ct. 1439, 1449 (1993). The Fifth Amendment's guarantee of "[d]ue process is satisfied only by a full and fair hearing." Ibrahim, 821 F.2d at 1550. A fair hearing occurs when applicants are given notice of the hearing and an opportunity to be heard. See Anin v. Reno, 188 F.3d 1273, 1277 (11th Cir. 1999) (per curiam). Courts have found due process was violated where an asylum applicant was not given proper notice of a potential country of deportation and subsequently was ordered removed to that country. See Kossov v. INS, 132 F.3d 405, 408 (7th Cir. 1998).

Based on the foregoing precedent, we conclude that petitioners' argument about a lack of notice they could be deported to Russia is without merit. The record reflects that when asked to name a country of deportation at their hearing before the IJ, the Protesenkos declined to name a particular country. Notwithstanding this, the government submitted a State Department Country Report for Russia and there were extended colloquies in the record about the petitioners' ties to Russia and their interactions with the Russian government. In addition, at one point in the record, the issue of denominating Russia as a potential country of deportation was discussed. See AR at 81. Moreover, Vera Protsenko was offered an opportunity to discuss why Russia would not be a suitable country of deportation. See AR at 96-98. Accordingly, in contrast to the facts in Kossov,

13

the record in this case reveals that the petitioners were given ample notice and an opportunity to be heard on the issue of Russia as a potential country of deportation. Thus, we reject the petitioners' argument that their due process rights were violated by the purported failure to notify them that they could be deported to Russia. Additionally, we note that when an alien refuses to designate a removal country, as in the instant case, the Attorney General has "very broad discretion" in specifying the country to which the alien will be sent. Najjar, 257 F.3d at 1295. Because the petitioners were ordered removed to a country pursuant to the regulations established by 8 U.S.C. § 1231(b)(2)(E), the IJ did not abuse its discretion in denominating Russia as the country of deportation.[3]

2. IJ's Alleged Bias

As we noted previously, due process requires that petitioners are afforded "a full and fair hearing." Ibrahim, 821 F.2d at 1550. Courts have recognized that due process guarantees that petitioners in removal proceedings "are entitled to an unbiased arbiter who has not prejudged their claims." Ahmed v. Gonzales, 398 F.3d 722, 725 (6th Cir. 2005). Due process is violated when an IJ abandons the role of neutral factfinder and becomes a partisan advocate in the proceedings. See

---

[3] In addition, the petitioners argue that the IJ erred in making its removal order because it failed to determine first whether they were "stateless." Because a finding on the issue of statelessness would not have impacted the analysis of petitioners' asylum applications, see Najjar F.3d at 1295, this argument is without merit.

Reyes-Melendez v. INS, 342 F.3d 1001, 1006-07 (9th Cir. 2003). Where the IJ's inquiry and statements are supported by the record, however, there is no due process violation. See id.

Based on the foregoing, we reject petitioners' due process claim regarding the IJ's bias. In characterizing the alleged attacks on petitioners by anti-Russian groups, the IJ noted that these events stemmed from a "backlash" by Estonians newly independent from the Soviet regime. Rather than showing a bias on the part of the IJ, this characterization of events finds support in the record in the Country Report for Estonia. See AR 172-73. Moreover, in contrast to situation in which the IJ revealed its bias by aggressively questioning an asylum applicant, see, e.g., Reyes-Melendez, 342 F.3d at 1007, the record does not demonstrate that the IJ actively questioned the petitioners or assumed the role of a partisan advocate. Moreover, assuming the IJ's comments could be construed as a due process violation, petitioners have failed to demonstrate they were substantially prejudiced. Because petitioners conceded removability, and because we have determined that substantial evidence did support the IJ's denial of their asylum application, petitioners cannot show the outcome would have been different in the absence of any due process violation. Accordingly, we reject petitioners' due process claim regarding the IJ's purported bias.

### III. CONCLUSION

On appeal, Vera and Juri Protsenko petitioned for review of the BIA's affirmation of the IJ's order denying their application for asylum and withholding of removal and directing their removal to Russia. As we have explained, the IJ's denial of their asylum application was supported by substantial evidence and we discern no reversible due process violations in the removal proceedings. Accordingly, the **PETITION** is **DENIED**.