NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 08a0098n.06
Filed: February 6, 2008

No. 06-4123

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

YULIYA KARNAUKH,

      Petitioner,

        v.

MICHAEL MUKASEY, United States Attorney
      General,

      Respondent.

On Petition for Review of an
Order of the Board of
Immigration Appeals

_____/

**Before:**     **GUY, GILMAN, and McKEAGUE, Circuit Judges.**

**PER CURIAM.**    Petitioner Yuliya Karnaukh, a native and citizen of Ukraine, petitions for review of the order of the Board of Immigration Appeals (BIA) vacating an immigration judge's (IJ) decision granting her request for asylum under Section 208 of the Immigration and Nationality Act (INA), 8 U.S.C. § 1158.[1] Petitioner sought asylum, claiming a fear of future persecution on account of her religion and ethnicity by virtue of having committed herself to the practice of Judaism while in the United States. The BIA concluded that, even if credible, petitioner had nonetheless failed to establish a well-founded

_____

[1]Petitioner also requested withholding of removal and protection under the Convention Against Torture (CAT), but did not challenge the IJ's denial of this relief before the BIA and has not raised any arguments concerning the denial of such relief in this appeal.

fear of persecution if she were to return to Ukraine. Petitioner argues that the BIA failed to address the evidence she presented concerning the persecution of Jews in Ukraine, and that the BIA's determination that she had not met her burden of proof was not supported by substantial evidence. For the reasons set forth below, we deny the petition for review.

## I.

Karnaukh was born in 1975 in Kiev, Ukraine, which was then part of the Soviet Union. She entered the United States on a non-immigrant visa on May 2, 1998, and was authorized to stay until November 1, 1998. Petitioner overstayed her visa, began to explore Judaism in November 1998, gave birth to a son in March 1999, and committed herself to the practice of Judaism in the fall of 2000. Karnaukh filed an application for asylum in November 2000. A Notice to Appear charging her with being subject to removal was issued on April 12, 2001. Petitioner made a first appearance in October 2001, and, after a series of continuances, a merits hearing was finally held on January 28, 2005.

There is no claim that petitioner or anyone in her family experienced past persecution while in Ukraine. Petitioner explained that her mother identified herself as Jewish, but concealed that fact and maintained a few Jewish traditions at home (such as making latkes at Hanukkah). Her father was Orthodox Christian, and they would sometimes go to an Orthodox Russian Church. Petitioner testified that she had always had an interest in Judaism, but only began to learn about it after Jewish friends took her to services and gave her literature in November 1998. She began attending services, joined a temple, and committed to practicing the faith. Although the Department of Homeland Security (DHS) contested the

timeliness of her application, the IJ found, and the BIA agreed, that she qualified for an exception to the one-year deadline for filing her asylum application.  The timeliness of the application is not at issue on appeal.

Karnaukh testified that she believes people will "hate her" if she returns to Ukraine and practices Judaism.  Her mother, who still lived in Ukraine, told her that other people were mistreated when they returned and revealed that they were Jewish.  Karnaukh related that she knew a student in school with her from 1982 to 1992, who was constantly beaten because he was Jewish.  Petitioner also testified that she believed that the rise in nationalistic feelings in Ukraine presented more danger to Jews.  In support of her claim to a well-founded fear of persecution, Karnaukh relied on a report and several news bulletins that were published by the Union of Councils for Jews in the Former Soviet Union (UCSJ).  She also relied on the telephonic testimony of Nicolai Butkevich, the Research and Advocacy Director for UCSJ and author of the UCSJ's report entitled "Chronicle of Antisemitism in Ukraine: 2002-2004."  Finally, petitioner offered an interview with a political scientist who explained that there had been a significant increase in the publication of anti-Semitic material in Ukraine during 2004.

The UCSJ's report acknowledged that the government of Ukraine no longer had an official policy of anti-Semitism and had made "friendly gestures toward the Jewish community."  The report also concluded that there had been a worsening of the situation for Jews in several parts of the country between 2002 and 2004, pointing specifically to two attacks on synagogues in 2002, four beatings of Jews in Kiev in 2003 and 2004, and several

assaults on Jews in other areas of the country between 2002 and 2004. Detailing the specifics of incidents of anti-Semitic violence and vandalism, the UCSJ report indicated that Ukranian authorities had made few arrests. Butkevich nonetheless conceded that Ukranian authorities had used the country's "hate crimes" law to prosecute a group of youths in connection with the attack by skinheads on the central synagogue in Kiev in 2002.

Butkevich testified that there had been an increase in anti-Semitic violence in the previous two years, which he attributed to political instability, a rise of nationalism, and the use of anti-Semitic propaganda by politicians in the recent election. Although the UCSJ's report pointed to anti-Semitic statements by then President Leonid Kuchma, Butkevich conceded that newly installed President Viktor Yushchenko had not made anti-Semitic remarks. Butkevich also noted that a member of Yushchenko's party had made anti-Semitic statements, but acknowledged that the politician in question had been forced out of the party.

The DHS offered news reports from just days before the hearing about statements made by Yushchenko. Specifically, Yushchenko declared a commitment to religious freedom in his inaugural speech and rejected anti-Semitism during a trip to Poland to commemorate the Soviet liberation of Auschwitz. Central to this appeal were the Department of State's Ukraine Country Reports of Human Rights Practices for 2003 and the Ukraine Religious Freedom Report for 2003. These reports described anti-Semitic violence in Ukraine as "sporadic" and "infrequent," while noting that some ultranationalist groups and newspapers continued to publish anti-Semitic material. The Religious Freedom report discussed the "small but significant" Jewish population in Ukraine, the historical fact that

many of its Jews perished in the Holocaust or were victims of Soviet repression, and the "demographic difficulties" faced by the Jewish community due to further emigration from Ukraine. Nonetheless, the Ukrainian government was proceeding with the return of property to religious communities, including the Jews. The report concluded that "Jewish life continues to flourish, with additional communities registered every year due to an increased proportion of Jews practicing their faith (helped by an increase in the number of Rabbis entering the country . . . since independence) and an increased willingness of individuals to identify themselves openly as Jewish."

In an oral decision following the hearing, the IJ found that petitioner was credible, determined that her asylum application was timely, and found that she had demonstrated a subjective fear of future persecution. Then, giving more weight to Butkevich's testimony than the Department of State's reports, the IJ concluded that petitioner had also established an objectively reasonable fear of future persecution if she were to return to Ukraine. Finally, exercising his discretion, the IJ found no reason to deny petitioner asylum. The DHS appealed to the BIA. On July 21, 2006, the BIA issued its decision (1) agreeing that petitioner qualified for an exception to the one-year filing deadline for asylum; (2) finding "no need to disturb" the IJ's determination that the petitioner was credible; and (3) concluding that, even if credible, petitioner had not sustained her burden of providing that she had a well-founded fear of persecution if she were to return to Ukraine. This appeal followed, and we granted petitioner's motion for a stay of removal pending resolution of this appeal.

**II.**

When the BIA does not summarily affirm or adopt the IJ's reasoning and provides an explanation for its decision, we review the BIA's decision as the final agency determination. *Ilic-Lee v. Mukasey*, 507 F.3d 1044, 1047 (6th Cir. 2007); *Zaitona v. INS*, 9 F.3d 432, 434 (6th Cir. 1993). Questions of law in immigration proceedings are reviewed *de novo. Ali v. Ashcroft*, 366 F.3d 407, 409 (6th Cir. 2004). We will affirm the BIA's factual findings, as well as its determination that the petitioner failed to meet her burden to establish eligibility for asylum, if supported by substantial evidence. *Ceraj v. Mukasey*, __F.3d__, 2007 WL 4547727 (6th Cir. Dec. 28, 2007) (citing *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992)); *see also Singh v. Ashcroft*, 398 F.3d 396, 400 (6th Cir. 2005). The INA provides that "administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4).

**A.     Asylum Standards**

Disposition of an application for asylum involves a two-step inquiry: (1) whether the applicant qualifies as a "refugee" within the meaning of the Act; and (2) whether the applicant "merits a favorable exercise of discretion by the Attorney General." *Perkovic v. INS*, 33 F.3d 615, 620 (6th Cir. 1994). A "refugee" is a person who is unable or unwilling to return to his home country because of either past persecution or a well-founded fear of future persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. § 1101(a)(42)(A); 8 C.F.R. § 1208.13(b). Because there is no claim of past persecution in this case, there is also no presumption of a well-

founded fear of future persecution.  8 C.F.R. § 208.13(b)(1).

As a result, petitioner must establish (1) that she has a fear of persecution in her country of origin on account of a protected ground, (2) that there is a reasonable possibility of suffering such persecution if she were to return to that country, and (3) that she is unable or unwilling to return to that country because of such fear.  *Mikhailevitch v. INS*, 146 F.3d 384, 390 (6th Cir. 1998).  Persecution for purposes of asylum means more than isolated incidents of verbal harassment or intimidation unaccompanied by any physical punishment, infliction of harm, or significant deprivation of liberty.  *Id*.

A well-founded fear of persecution has both a subjective and an objective component: "an alien must actually fear that he will be persecuted upon return to his country, and he must present evidence establishing an 'objective situation' under which his fear can be deemed reasonable."  *Perkovic*, 33 F.3d at 620-21 (citing *INS v. Cardoza-Fonseca*, 480 U.S. 421, 430-31, 440 (1987)).  It is not necessary for the applicant to demonstrate that he will probably be persecuted because "[o]ne can certainly have a well-founded fear of an event happening when there is less than a 50% chance of the occurrence taking place."  *Cardoza-Fonseca*, 480 U.S. at 431.

**B.    Analysis**

Here, the BIA accepted the finding that petitioner was credible—and therefore presumably that her fear of future persecution was genuine—but concluded that petitioner's "testimonial and documentary evidence describing incidents of anti-Semitic violence [was] not inconsistent with Department of State reports indicating that, overall, acts of anti-

Semitism in the Ukraine are relatively infrequent (*Compare* Tr. at 57-67; Exh. 5, *with* Exh. 6)." Comparing the UCSJ's report and the State Department reports for 2003, the BIA also cited to the State Department reports for 2005 and this court's decision in *Koliada* before concluding that petitioner had not established a well-founded fear of future persecution. *Koliada v. INS*, 259 F.3d 482, 487-88 (6th Cir. 2001).

Petitioner argues that the BIA "misapplied" the facts by failing to recognize or possibly even consider the evidence she presented. On the contrary, the BIA's decision reflects that it considered and weighed the evidence. There was no real dispute that the incidents identified by Butkevich happened—the disagreement was over the conclusions to be drawn from the evidence. This is reflected in petitioner's further argument that the BIA should not have relied on the State Department reports. Petitioner specifically points to a "seemingly contradictory" statement that the Jewish community "flourished" despite the "demographic difficulties" that resulted from continued emigration from Ukraine. The crux of petitioner's criticism, however, is based on Butkevich's testimony that the State Department underreported incidents of assaults on Jews between 2002 and 2004. Butkevich detailed approximately eight assaults that were not mentioned in the State Department reports and suggested that this might be explained by a lack of communication with the United States Embassy in Ukraine.

As we explained in *Koliada*, other circuits have both afforded significant deference to State Department reports in assessing country conditions, and criticized such reports as flawed or colored by political considerations. *Koliada*, 259 F.3d at 487 (citing cases). One

of the cases noted in *Koliada* also observed that although State Department reports may be flawed, conflicting reports of private groups or news organizations "may have drawbacks of their own." *Gonahasa v. INS*, 181 F.3d 538, 543 (4th Cir. 1999). Regardless of the criticisms that may be leveled against the reports regarding country conditions, our inquiry is dictated by the substantial evidence standard. *Koliada*, 259 F.3d at 488. The Fourth Circuit aptly explained that:

> In any event, our task is not to reweigh the evidence and determine which of the competing views is more compelling. It is instead to ensure that substantial evidence supports the BIA's judgment. In most cases, a State Department report provides such substantial evidence. Absent powerful contradictory evidence, the existence of a State Department report supporting the BIA's judgment will generally suffice to uphold the Board's decision. Any other rule would invite courts to overturn the foreign affairs assessments of the executive branch.

*Gonahasa*, 181 F.3d at 542-43. Given the deferential standard of review, we may not reverse the BIA's decision simply because we might have decided the matter differently. *Koliada*, 259 F.3d at 486; *Mikhailevitch*, 146 F.3d at 388.

Applying this standard, we must also keep in mind that harassment or discrimination alone does not rise to the level of persecution, *Mikhailevitch*, 146 F.3d at 389-90, and that persecution "'does not include every sort of treatment our society regards as offensive.'" *Ali*, 366 F.3d at 410 (citation omitted). After review of the record before the BIA, we cannot conclude that the evidence would *compel* a finding that there was a reasonable possibility that petitioner would be subjected to persecution if she were to return to Ukraine. Accordingly, we **DENY** the petition for review.