NOT RECOMMENDED FOR PUBLICATION
File Name: 05a0600n.06
Filed: July 14, 2005

No. 04-3588

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| ALEKSANDER GJOKA, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | ON PETITION FOR REVIEW OF A |
| v. | ) | DECISION OF THE BOARD OF |
| | ) | IMMIGRATION APPEALS |
| ALBERTO R. GONZALES, | ) | |
| | ) | |
| Respondent-Appellee. | ) | |
| | ) | |

**Before:  NELSON and GILMAN, Circuit Judges; DONALD, District Judge.**[*]

**RONALD LEE GILMAN, Circuit Judge.**  In July of 2001, Aleksander Gjoka, a citizen

of Albania, entered the United States using a fraudulent Slovenian passport.  He subsequently

applied for asylum, the withholding of removal, and protection under the Convention Against

Torture (CAT), alleging that he had been the target of political violence during the June 2001

election in Albania.  The account that Gjoka gave to the immigration officer when he entered the

United States differed from the accounts given in his asylum application and in testimony before an

immigration judge (IJ).

Gjoka's claims of persecution were found by the IJ not to be credible, causing his requests

for asylum, the withholding of removal, and protection under the CAT to be denied.  The Board of

_____

[*]The Honorable Bernice B. Donald, United States District Judge for the Western District of Tennessee, sitting
by designation.

Immigration Appeals (BIA) affirmed without opinion. For the reasons set forth below, we **DENY** the petition to review the decision of the BIA.

## I. BACKGROUND

**A.      Factual background**

In July of 2001, Gjoka arrived in Los Angeles, California bearing a false Slovenian passport. He sought admission to the United States under the Visa Waiver Program. Gjoka gave his reasons for leaving Albania (1) in a sworn statement before an immigration inspector in July of 2001, (2) in an asylum application filed in July of 2002, and (3) in testimony before the IJ in October of 2002.

*1.      Statement to the immigration inspector*

Upon his arrival in Los Angeles, Gjoka gave a sworn statement to an immigration inspector as part of his Visa Waiver Program application. He acknowledged that he was a citizen of Albania and admitted that the Slovenian passport was not authentic. The immigration inspector then asked him a series of questions about his situation in Albania and his reasons for coming to the United States:

Q:      What is the purpose of your entry to the United States?

A:      My purpose is to come here to secure my life and I have strong reasons for that.

Q:      What are the strong reasons you have for coming here?

A:      It is because of the elections in Albania. I was a representative of the Democratic Party. In my area there were problems during the elections. The Socialist Party had manipulated the vote counts and wanted me to sign documents to agree that the counts were correct. One of the Socialist party members, and a militant he was with, took me behind a building and hit me

to force me to sign the documents. My life was also threatened by them. Two days after I refused to sign the documents, the Democratic [P]arty won in my area. After it was announced . . . I was shot at in my car. I think the attempt on my life was made by these people. I also have another problem with my father as well, so the attempt . . . may have been made by these other people.

Q: How many life-threatening problems, other than the problem with the Socialist [P]arty, do you have in Albania?

A: I also have a problem with my father not being willing to surrender his property to neighbors of his.

Q: Is the dispute over your father's property[] related in any way to a political, racial or religious matter?

A: No. It is a dispute over the ownership of the property.

Q: How long do you intend to stay in the United States?

A: I don't know. The elections are in four years and the Socialists are now in power. . . . [I]f the Socialists remain on [sic] power I don't know when I can return. Also, I have a law degree and I applied with the government but they didn't select me.

. . .

Q: Is the fact that you were not selected as a lawyer with the government also
a reason why you came to the United States?

A: The main reason is because of the elections, but this is a reason as well.

Following this exchange, Gjoka's application for admission under the Visa Waiver Program was

denied.

### 2. *Asylum application*

Gjoka applied for asylum approximately a year later. In his application, he claimed that he had been persecuted in Albania because of his religion and his political opinions, and he gave a second account of the election-day incident:

> Most recently, I was shot at. I believe that the shooting incident was directly related to a threat that I received two days before. I was working as an election official on June 24, 2001. I was representing the [D]emocratic [P]arty. I witnessed the representative of the Socialist Party stuffing the ballot boxes. A fight ensued and another member of the Socialist Party pulled a gun on me. The crowd was able to get the gun away from him and when all was said and done, he threatened me and told me "[i]f you try again, I'm going to kill you." Two days later[,] as I was driving home in the evening, my car was shot at. The rear window was shattered. The police have not investigated to determine who it was who shot at me. There were other incidents of being threatened and robbed at gun point. I made police reports. It seems that the police either do not have the will or the ability to solve these crimes against me.

He submitted a personal statement with his asylum application, and this statement repeated the claim that Gjoka "witnessed [the Socialist official] stuffing the ballot box" and that another Socialist official threatened him with a gun.

Gjoka gave a different account of his personal background, however, that contradicted his previous claim of having graduated from law school. According to his asylum application, Gjoka had "finished two years of pre-law" by 2001, but he chose to defer attending law school in order to gain work experience.

### 3. *Testimony before the IJ*

Gjoka described the election-day incident in his testimony before the IJ, but what he said differed in significant ways from his previous accounts. In particular, Gjoka claimed that the ballot box was stuffed when he stepped outside for a moment, and that he learned of it only when he was

"notified by another person" after his return. The IJ interrupted to ask whether Gjoka had actually

witnessed the event, and Gjoka stated that he had not. Gjoka claimed that he had lied to the Socialist

Party official about having seen the stuffing of the ballot box in order to provoke the official, but

again confirmed that he had not actually seen it. He also claimed that he and the Socialist Party

official who had threatened him with a gun were both taken to the police station, but that neither was

charged with a crime. Two hours after they were released, the Socialist Party official allegedly

again threatened Gjoka, and, two days later, the rear window of Gjoka's car was shot out.

According to Gjoka, he and his family had also been the victims of several crimes in Albania,

including two burglaries of his father's automobile service station and he personally being robbed

at gunpoint.

Gjoka's testimony about his personal background also differed from his two previous

accounts, and contradicted the documentation that he submitted to the court. He claimed that he

completed his law studies between 1996 to 2000, but "didn't receive the degree because I was

supposed to go 2 more years to do another application so I was able to be qualified as an attorney."

One of the documents Gjoka submitted, however, was a diploma from the University of Shkodra,

dated July 8, 2000, stating that he had completed "the full course of Faculty of Justice, Juridical

profile," and that he had been "awarded the degree [of] Jurist." Gjoka also testified that he became

a member of the Democratic Party approximately six months before the June 2001 election, but

submitted a party membership card dated August 23, 2000.

> **4.      *Conditions in Albania***

Gjoka and the government both introduced reports on the conditions in Albania in 2001.

These documents consist of two U.S. State Department country reports as well as materials from

Amnesty International. The State Department Country Report on Human Rights Practices for 2001

states that the June 2001 elections "were conducted in a peaceful atmosphere," and notes that,

despite voting irregularities, the Organization for Security and Cooperation in Europe "judged the

elections to have improved over past elections. . . ." Another State Department report, the 2001

Profile of Asylum Claims and Country Conditions for Albania, specifically addresses claims of

political persecution:

> With the Socialist Party currently leading a coalition government, it is highly unlikely in today's circumstances that many applicants will have credible claims to political persecution. Such claims are generally amplified by the assertion that a reconstituted communist regime has come to power. Claims relying on this premise are contradicted by virtually all state actions, and those who were truly persecuted by the communists often resent the comparison. Both major parties trace their roots to the communist regime and both repudiate it thoroughly. . . . There is virtually no evidence that individuals are targeted for mistreatment on political grounds. Far more prevalent is organized and amateur crime. . . .

This report also casts doubt on claims of religious persecution, noting that "[t]he Christian minority

freely practices its faith, and the leadership reflects the religious diversity of the population," with

the Albanian cabinet being "divided about evenly between Muslims and Christians."

The Amnesty International materials paint a bleaker picture, giving examples of the use of

torture by the police. As the report for 2001 notes, however, "[m]ost incidents of torture took place

in police stations following arrest."

**B.      Procedural background**

After a detailed discussion of the inconsistencies between Gjoka's statement to the immigration inspector, his asylum application, and his testimony, the IJ concluded that "[h]is story has shifted so severely over a period of time even from his application signed a few moments [before] his testimony, that he has not demonstrated [that] anything that he said should be relied upon." The IJ noted that Gjoka gave a number of stories about the election-day incident, but "even if you believe one of them or a mishmash of them, he has not suffered any past persecution." Because of the adverse credibility determination and the finding that he had not suffered any past persecution, Gjoka's application for asylum, the withholding of removal, and protection under the CAT was denied.

In a per curiam order, the BIA affirmed the IJ's decision. The order explicitly invoked the BIA's affirmance-without-opinion procedure.

## II. ANALYSIS

### A. Standard of review

The BIA's findings of fact "are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. 1252(b)(4)(B). "Credibility determinations are findings of fact," and an adverse credibility determination will be upheld if it is supported by substantial evidence. *Yu v. Ashcroft*, 364 F.3d 700, 703 (6th Cir. 2004). This is "a deferential standard [that] 'plainly does not entitle a reviewing court to reverse . . . simply because it is convinced that it would have decided the case differently.'" *Klawitter v. INS*, 970 F.2d 149, 151-52 (6th Cir. 1992) (citation omitted) (alteration in original).

We review both the BIA's decision and the IJ's decision where "the Board adopts the decision of the IJ in lieu of issuing its own opinion." *Santana-Albarran v. Ashcroft*, 393 F.3d 699, 703 (6th Cir. 2005) (citation and quotation marks omitted). Because the BIA "affirm[ed], without opinion, the results of the decision below," we will focus on the IJ's opinion in the present case.

**B.      Denial of asylum and the withholding of removal**

   *1.      Asylum*

"An applicant for asylum bears the burden of establishing that he qualifies as a refugee 'either because he has suffered actual past persecution or because he has a well-founded fear of future persecution.'" *Koliada v. INS*, 259 F.3d 482, 487 (6th Cir. 2001) (quoting 8 C.F.R. § 208.13(a)-(b) (2001)). In order to be eligible for asylum, an applicant must have suffered persecution "on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 C.F.R. § 208.13(b)(1). As noted by the IJ, the conclusion that Gjoka failed to meet this burden was based on an adverse credibility determination stemming from Gjoka's inconsistent statements about both the election-day incident and his own personal background, as well as the fact that "the corroboration [Gjoka] proffered to the Court did not corroborate his claim, but [rather] . . . attacked his credibility."

The question of whether substantial evidence supports the adverse credibility determination made by the IJ and affirmed by the BIA is an issue we need not reach in order to determine whether the BIA erred in denying Gjoka's petition for asylum. For even if Gjoka was threatened by a Socialist Party official, and even if the rear window of his automobile was shot out, Gjoka has not established that he suffered "persecution" within the meaning of 8 C.F.R. § 208.13(b)(1). The

alleged threat at the polling place was not from a government official, but from another election observer. Moreover, Gjoka claimed in his testimony before the IJ that he had lied in order to provoke a confrontation, which, if true, might explain the hostile reaction of the Socialist Party election worker. The threat to Gjoka would thus be for a reason other than "membership in a particular social group[] or political opinion." 8 C.F.R. § 208.13(b)(1).

Furthermore, Gjoka does not claim to have been persecuted by the police after the incident, and he offers no evidence other than speculation that Socialist Party officials were responsible for the gunshot that shattered his rear window. For these reasons, we need not reach the IJ's adverse credibility determination in order to agree with the BIA that Gjoka has failed to establish that he was persecuted within the meaning of 8 C.F.R. § 208.13(b)(1). We therefore affirm the decision of the BIA to deny Gjoka's application for asylum.

### 2. *Withholding of removal*

In order to establish that Gjoka is eligible for the withholding of removal, he must show not only that he has a "well-founded fear of future persecution," *Koliada*, 259 F.3d at 487, but that "there is a clear probability that he will be subject to persecution if forced to return to the country of removal." *Pilica v. Ashcroft*, 388 F.3d 941, 951 (6th Cir. 2004). This standard is significantly "more stringent" than the standard for asylum. *Koliada*, 259 F.3d at 488.

The evidence presented by Gjoka does not establish that he was persecuted in the past, much less that he has a well-founded fear of future persecution. This evidence is therefore even less supportive of Gjoka's claim that there is an objective likelihood that he would be persecuted in the future. We therefore affirm the BIA's decision to deny the withholding of removal.

## C.     Denial of protection under the CAT

To obtain relief under the CAT, an applicant bears the burden of establishing that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2).  The standard of review of Gjoka's CAT claim consequently does not differ from the analysis of his request for asylum and withholding of removal.  *See Castellano-Chacon v. INS*, 341 F.3d 533, 552 (6th Cir. 2003) ("This court applies the same standard of review when dealing with claims . . . pursuant to the Convention Against Torture as it does when reviewing claims under 8 U.S.C. § 1231(b)(3) [the withholding of removal].")  Because Gjoka failed to establish a valid claim for the withholding of removal, or even a claim under the less-stringent standard for asylum, he cannot succeed with his claim under the CAT.

## D.     The BIA's affirmance-without-opinion procedure

Gjoka's final argument is that the BIA's use of its affirmance-without-opinion procedure was itself improper because "the Immigration Judge committed serious errors in the factual determinations made in [Gjoka's] case," and "the cumulative effect of these errors warranted a written decision after review by a three-member panel."  This court, however, has held that

> it is not a due process violation for the BIA to affirm the IJ's decision without issuing an opinion.  Even if the BIA would view the factual and legal issues differently from the immigration judge, the summary-affirmance-without-opinion rule renders the IJ's decision the final agency order, and we review that decision.

*Denko v. INS*, 351 F.3d 717, 730 (6th Cir. 2003) (citation and quotation marks omitted).  As the court in *Denko* noted, "we are not forced to guess at the rationale of the BIA, but instead we evaluate the IJ's explanation as that of the Board; the Board cannot rely on an unarticulated basis

for its determination." *Id*. We therefore hold that the use of its affirmance-without-opinion

procedure by the BIA was not a violation of Gjoka's due process rights.

### III. CONCLUSION

For all of the reasons set forth above, we **DENY** the petition to review the decision of the

BIA.