NOT RECOMMENDED FOR PUBLICATION
File Name: 18a0376n.06

Nos. 16-4150/17-3346/17-3747

|  |  |  |
|---|---|---|
| UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT | | **FILED**<br>Jul 26, 2018<br>DEBORAH S. HUNT, Clerk |

| | |
|---|---|
| REMON SAMIR WELSON, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) ON PETITION FOR REVIEW |
| | ) FROM THE UNITED STATES |
| JEFFERSON B. SESSIONS, III, Attorney General, | ) BOARD OF IMMIGRATION |
| | ) APPEALS |
| Respondent. | ) |
| | ) |

BEFORE:    ROGERS and BUSH, Circuit Judges; WATSON, District Judge.[*]

ROGERS, Circuit Judge. Remon Welson is a Coptic Christian, a member of a religious group comprising roughly ten percent of Egypt's population. In 2015, he traveled from Egypt to the United States and sought asylum and withholding of removal on the basis of his Coptic Christian religion. An immigration judge denied his applications, concluding that he was not credible and that he had not demonstrated a well-founded fear of persecution in Egypt, a precondition for either form of relief. Welson appealed to the Board of Immigration Appeals and also filed numerous motions to have his proceedings remanded, reopened, or reconsidered. The Board denied all these motions and denied relief. In this appeal, Welson principally argues that the Board should not have denied his various motions to reopen or reconsider because they were

---

[*] The Honorable Michael H. Watson, United States District Judge for the Southern District of Ohio, sitting by designation.

supported by new evidence of violence against Egyptian Coptic Christians by the Islamic State of Iraq and the Levant, and that this additional evidence demonstrated that Welson now qualifies for relief from removal. However, because Welson's additional evidence—mostly consisting of news articles—did not show conditions that were materially different from those described in the documents considered by the immigration judge, the Board did not abuse its discretion in denying his motions to reopen or reconsider.

Welson, a native and citizen of Egypt, arrived in the United States at Detroit Metropolitan Airport on October 10, 2015. Immigration officials determined that he was not in possession of a valid entry document, and the Government initiated removal proceedings on October 27, 2015. Welson appeared before an immigration judge ("IJ") with counsel on December 10, 2015, and conceded removability. The IJ designated Egypt as the country of removal, and Welson filed an application for asylum, withholding of removal, and protection under the U.N. Convention Against Torture.

An individual hearing was held before the IJ on February 2, 2016, and February 17, 2016. Welson testified that he is a Coptic Christian who has lived his whole life in Sohag, Egypt, in a home with his mother and younger brother. He testified that, in 2013, members of the Muslim Brotherhood burned down the cathedral at which he worshipped; that unknown persons had twice smashed his car window to remove a cross from within; and that the door to his home had been marked with a symbol indicating that it would be burned (although to this day it has not actually been the target of arson). The focus of Welson's testimony, however, was an incident that occurred on May 20, 2015. According to Welson's testimony at the hearing, on that day he was returning home from work when five Muslim men confronted him outside his home. The men told Welson that he was not welcome in the area because he was Christian, and then assaulted him. Welson

recognized one of his assailants, whom the others called "Mohammed," as an attendee of the local mosque. Once the assault ended, Welson went to the nearest police station to report the incident, but the police declined to file a report until Welson obtained a medical report documenting his injuries. Welson then went to the hospital, where he was treated and given a medical report. He returned to the police station with the medical report, and the police then formally accepted Welson's complaint. Welson testified that he saw Mohammed again on the street one week after the assault, and that Mohammed threatened him. After the assault, Welson became stressed and afraid, and he decided to seek asylum in the United States. In October 2015, he flew to the United States for that purpose.

Welson's aunt and uncle also testified at the individual hearing, as well as one of Welson's childhood friends who had been granted asylum in the U.S. due to an unrelated incident. All three of these witnesses are Egyptian Coptic Christians who now reside in the U.S. They each testified that they had recently traveled to Egypt but took precautions while there.

The IJ denied Welson relief. First, the IJ determined that Welson was not credible, reasoning that Welson's account of the assault had "evolved over time." In particular, the IJ noted that key details of his story had changed from the initial account he gave to immigration officials shortly after entering the U.S. to the testimony he gave at the hearing before the IJ. The IJ concluded that this indicated embellishment. Additionally, the IJ explained that Welson's credibility was damaged because Welson claimed to have brought relevant documents with him to the U.S., such as the police report and medical records chronicling the assault, but Welson without

explanation declined to submit these documents to the IJ.[1]  The IJ accordingly drew a "negative inference" from Welson's "failure to produce allegedly available corroborating evidence."

Because "[a]n adverse credibility determination is fatal to claims for asylum and relief from removal," *Slyusar v. Holder*, 740 F.3d 1068, 1072 (6th Cir. 2014), the IJ denied Welson's applications for relief.  The IJ also concluded in the alternative that asylum should be denied because Welson did not establish his eligibility for that form of relief.  To be eligible for asylum, an applicant must show that he qualifies as a "refugee" within the meaning of 8 U.S.C. § 1101(a)(42)(A).  As relevant here, that provision defines a refugee as one with a "well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion" in his native country.  If an applicant establishes that he has been subject to persecution in the past, then it is rebuttably presumed that he has a well-founded fear of persecution in the future.  8 C.F.R. § 1208.13(b)(1).  Otherwise, the applicant must establish a well-founded fear of future persecution, which he can do by, among other things, demonstrating that there is a pattern or practice in his country of nationality of persecuting a covered group of persons to which the applicant belongs.  *Id.* § 1208.13(b)(2)(iii).

Here, the IJ concluded that Welson neither established past persecution nor a well-founded fear of future persecution.  The IJ first determined that Welson's "experiences in Egypt do not amount to past persecution."  Second, the IJ determined that Welson did not show a well-founded fear of future persecution because his "evidence does not establish a pattern or practice of persecution against persons similarly situated in Egypt."  The IJ reasoned that "[a]lthough the news

---

[1] Welson initially claimed that this evidence was taken from him by Government officials and never returned, but the Government later informed the IJ that it had provided Welson with copies of all the documents in its possession that it had received from Welson, and Welson's counsel acknowledged receipt of the same.  Welson does not argue in this appeal that the Government in fact failed to return any of his documents.

articles provided by [Welson] show that Copts are targeted by Muslim extremists, they also establish that the Egyptian government is taking steps to protect Coptic Christians." (Internal citation and quotation marks omitted.) The IJ acknowledged that the State Department's 2014 International Religious Freedom Report, which Welson submitted in evidence, showed some incidents "which would constitute persecution of Coptic Christians," but the IJ reasoned that those incidents involved Coptic Christians who were not similarly situated to Welson in relevant ways, as Welson "is not a convert from Islam and does not claim to be politically active or particularly vocal about the mistreatment he believes he has faced in Egypt." The IJ further observed that Egyptian president Abdel Fattah el-Sisi has made efforts to improve conditions for Coptic Christians, and that, according to the State Department's 2014 Human Rights Report on Egypt, more Coptic Christians are being included in the Egyptian government. Finally, the IJ emphasized that members of Welson's family continue to live in Egypt unharmed, including his mother and brother who live in the same house near which Welson was assaulted, and also that Welson's three witnesses had all recently traveled to Egypt without being harmed.[2]

Welson appealed to the Board of Immigration Appeals ("BIA" or "Board"), and on September 9, 2016, the Board upheld the IJ's denial of relief. The BIA affirmed the IJ's adverse credibility finding and, in the alternative, agreed with the IJ that Welson had not demonstrated either past persecution or a well-founded fear of future persecution. The BIA agreed with the IJ's reasoning that Welson's "persecution claim is undercut by the fact that his mother and siblings

---

[2] The IJ also denied Welson's application for withholding of removal, reasoning that an applicant for that form of relief must make an even more difficult showing than the one necessary to obtain asylum, and because Welson did not qualify for asylum he necessarily did not qualify for withholding of removal. *See Koliada v. INS*, 259 F.3d 482, 488–89 (6th Cir. 2001). In a footnote, the IJ held that Welson had abandoned his claim for protection under the Convention Against Torture because his counsel had expressly disclaimed that Welson was pursuing that form of relief.

continue to live in Egypt apparently without harm." Along with his appeal, Welson also filed a motion to remand in light of changed country conditions, based on news articles detailing additional violence against Coptic Christians in Egypt. The BIA treated this as a motion to reopen and denied it. The Board explained that, to prevail on such a motion, an applicant must establish that if his proceedings were reopened "the new evidence offered would likely change the result in the case." *See Matter of Coelho*, 20 I. & N. Dec. 464, 473 (BIA 1992). The news articles that Welson submitted did not satisfy this standard, the Board explained, because they reported incidents of violence "similar to those accounted for by the State Department reports cited by the Immigration Judge," and thus would not likely produce a different outcome if the case were reopened.

Welson thereafter filed a timely motion to reopen, supported by more news articles allegedly showing worsened country conditions. On March 6, 2017, the Board denied this motion as well. By regulation, a motion to reopen must be accompanied by evidence that is "material and was not available and could not have been discovered or presented at the former hearing." 8 C.F.R. § 1003.2(c)(1). The Board reasoned that several of the articles Welson sought to introduce predated the Board's prior decision, and thus could not support a motion to reopen. Additionally, Welson's evidence "reflect[ed] conditions similar to those documents relied on by the Immigration Judge . . . as well as [those documents supporting] his previous motion to remand." In particular, Welson submitted a news article discussing a January 2017 Executive Order issued by President Donald Trump that temporarily suspended entry into the United States from several predominantly Muslim nations (Egypt was not one of them), but gave preferential treatment to Christians seeking to enter the U.S. from those nations. Welson argued that this was relevant because it demonstrated a new government policy of prioritizing the protection of Christians living in certain majority-

Muslim countries. The BIA rejected this argument, reasoning that the article did not identify any "law or other material change in policy which would affect [the Board's] previous decision."

Welson then filed a timely motion to reconsider the BIA's denial of his motion to reopen, along with supplemental filings further seeking to reopen his removal proceedings. On June 14, 2017, the Board denied these motions as well. A motion to reconsider must "specify[] . . . errors of fact or law in the prior Board decision," *id.* § 1003.2(b)(1), and the Board concluded that Welson's motion to reconsider failed because it did not do so; it identified no error of law or fact in the Board's prior decisions, nor any argument raised previously that the Board had overlooked. As for Welson's latest motion to reopen, the Board reasoned that it was time- and number-barred, *see id.* § 1003.2(c)(2), and so the Board could not consider it unless Welson showed changed country circumstances, *see id.* § 1003.2(c)(3)(ii). Welson based the motion to reopen on an article describing the April 2017 Palm Sunday Coptic church bombings in Egypt, and another article detailing a May 2017 incident in which gunmen opened fire on vehicles transporting Coptic Christians in Southern Egypt. The Board concluded that this evidence was not sufficient because it merely showed "a continuation of the strife and violence considered previously in this matter, rather than a material change in relevant country conditions." Moreover, the Board noted that Welson's family, along with millions of other Coptic Christians, continues to live in Egypt, and that the evidence submitted did not suggest that the Egyptian Government was complicit in these acts of violence.

Welson filed three petitions for review in this court, one for each of the BIA's decisions. On September 25, 2017, we ordered the three cases to be consolidated for review.

Welson offers a potpourri of arguments as to why the BIA's various decisions were in error. However, his arguments challenge only the BIA's denials of his numerous motions to

reopen or reconsider (including his motion to remand, which the BIA treated as a motion to reopen).[3] He does not contest the BIA's affirmance of the IJ's adverse credibility finding, or the BIA's determination in its first decision that, based on the evidence then before the IJ, Welson failed to demonstrate past persecution or a well-founded fear of future persecution. For the reasons that follow, each of Welson's arguments fails.[4]

Welson first argues that the BIA erred in all three of its decisions by denying his various motions to reopen or reconsider, because he submitted evidence sufficient to justify reopening in the form of documents describing an intensification of violence against Coptic Christians in Egypt, particularly violence perpetrated by the Islamic State of Iraq and the Levant ("ISIL"). However, this argument is unpersuasive. "The burden for a motion to reopen is a heavy one, and the movant must show 'that if proceedings before the immigration judge were reopened . . . the new evidence offered would likely change the result of the case.'" *Reyna v. Lynch*, 631 F. App'x 366, 371 (6th Cir. 2015) (ellipsis in original) (quoting *Coelho*, 20 I. & N. Dec. at 473). In other words, it is Welson's obligation to offer evidence that establishes a prima facie case for relief. *See Trujillo Diaz v. Sessions*, 880 F.3d 244, 249–50 (6th Cir. 2018). Welson has not carried this burden, because—as the Board reasoned—the evidence that Welson submitted along with his numerous motions to reopen or reconsider demonstrates conditions in Egypt that are not materially different

---

[3] A motion styled as a "motion to remand" may permissibly be treated as a motion to reopen. *See Bi Feng Liu v. Holder*, 560 F.3d 485, 489 n.4 (6th Cir. 2009). Welson does not argue on appeal that his motion to remand was inappropriately treated as a motion to reopen.

[4] In his principal brief, Welson moved this court to take judicial notice of a news article attached to his brief which was not submitted to the BIA. We deny the motion because we are "statutorily required to 'decide the petition [for review] only on the administrative record on which the order of removal is based.'" *Barakat v. Holder*, 621 F.3d 398, 406 (6th Cir. 2010) (brackets in original) (quoting 8 U.S.C. § 1252(b)(4)(A)). Moreover, this new article would not be relevant to any of the issues on appeal. Because the BIA never considered this article, the article is not relevant to the question of whether the BIA abused its discretion in denying Welson's motions to reopen.

from those reflected in the documents originally considered by the IJ. Therefore, he has not shown that this new evidence "would likely change the result in the case." *See Coelho*, 20 I. & N. Dec. at 473.

Welson submitted numerous articles and reports along with his motions to reopen or reconsider. He contends that these articles and reports show that he would at least qualify for asylum if the case were reopened, because they demonstrate escalating violence against Coptic Christians such that he would have a well-founded fear of persecution in Egypt on the basis of his religion. However, these additional documents generally depict conditions that are similar to those described in the evidence before the IJ. The IJ's opinion explicitly acknowledged that "the news articles provided by [Welson] show that Copts are targeted by 'Muslim extremists,'" but that the articles also showed that the Egyptian government was making efforts to protect Coptic Christians. The IJ's opinion cited trial Exhibit 3, which included numerous news accounts of violence committed against Coptic Christians by Muslim extremists. For instance, Exhibit 3 contained a BBC article entitled "Lives of fear for Egypt's Christians," which documented an incident in October 2013 in which gunmen opened fire outside a Coptic church in Cairo, killing four people. The article also described the burning of a Coptic church by a mob of Islamic extremists. Another article in Exhibit 3 stated that "Islamic extremists often attack Egyptian churches during Christian holidays," and also recounted an incident in which a Coptic Christian was pulled out of her car and killed after parking outside a church. The State Department's 2014 Human Rights Report, also included in Exhibit 3, added that "[t]errorist groups, including [a group affiliated with ISIL], conducted deadly attacks on government, civilian, and security targets throughout the country, including schools, places of worship, and public transportation."

In support of his motions to reopen, Welson chiefly relies on articles describing various recent acts of terrorism perpetrated by ISIL, including: the December 2016 bombing of a Coptic cathedral in Cairo; the April 2017 bombing of two Coptic churches, both in Northern Egypt, on Palm Sunday; and a May 2017 incident in Southern Egypt where gunmen fired on vehicles carrying Coptic Christians. However, as the BIA reasoned, these articles describe events which, while indisputably terrible and tragic, are nevertheless similar to those conditions considered by the IJ at Welson's individual hearing. Moreover, none of the additional reports and articles disturbs a key portion of the IJ's reasoning—namely, that Welson's family continues to live in Sohag, Egypt, unharmed, and that the Egyptian government under the leadership of President el-Sisi has undertaken to improve conditions for Coptic Christians. These new articles accordingly do not show that if the case were reopened Welson would likely prevail on his asylum claim. What is more, the BIA's denial of a motion to reopen is reviewed only for abuse of discretion. *Kukalo v. Holder*, 744 F.3d 395, 402 (6th Cir. 2011). As we have explained:

> the BIA has broad discretion in deciding whether to grant or deny a motion to reopen . . . . A denial of a motion to reopen will constitute an abuse of discretion if the denial "was made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis such as invidious discrimination against a particular race or group."

*Id.* (quoting *Balani v. INS*, 699 F.2d 1157, 1161 (6th Cir. 1982)). In light of the foregoing analysis, the BIA did not abuse its discretion in denying Welson's various motions to reopen.

Welson argues that our decision in *Mandebvu v. Holder*, 755 F.3d 417 (6th Cir. 2014), compels a different result, but *Mandebvu* is inapposite. The timeliness issue in that case related to the alien's initial asylum application, and not to a motion to reopen or reconsider a removal order. Untimeliness in applying for asylum may be excused by showing "the existence of changed circumstances which materially affect the applicant's eligibility for asylum." *See id.* at 424

(quoting 8 U.S.C. § 1158(a)(2)(D)). We held that, in order to show changed circumstances, an applicant need not show that he "would not have been eligible for asylum had he applied before the change in country conditions." *See id.* at 424–28. In other words, we concluded that an applicant might demonstrate changed circumstances even if the country conditions were bad enough to warrant a grant of asylum before the change in circumstances, and even worse afterward. This makes sense when the underlying concern is the applicant's degree of incentive to apply for asylum in the first place. But *Mandebvu*'s holding is not relevant here, because the BIA did not deny Welson's motions to reopen on the basis that he qualified for asylum both before and afterward. To the contrary, the BIA reasoned that Welson *did not* qualify either before his motions to reopen or afterward because Welson's "new" evidence was simply more of the same.

Welson also argues that the Board erred in concluding that the documents submitted with his motions to reopen reflected conditions similar to those described in the documents before the IJ because, according to Welson, "ISIS and ISIL were not present in Egypt at the time of [his] individual hearing," and therefore his additional evidence documenting ISIL's attacks must be new. But this argument fails because the record before the IJ included evidence of ISIL's activities in Egypt. As previously explained, the State Department's 2014 Human Rights Report specifically stated that an ISIL-affiliated terrorist group "conducted deadly attacks on government, civilian, and security targets throughout the country, including schools, places of worship, and public transportation." Welson notes that the record before the IJ included an article discussing the murder of 21 Egyptian Coptic Christians who were abducted and beheaded in Libya by members of ISIL. Based on this article, Welson argues that the IJ considered evidence of ISIL's activities only *in Libya*, and that therefore Welson's evidence of ISIL's activities *in Egypt* demonstrated conditions different from those considered by the IJ. But, as just discussed, it is not true that the

IJ only considered evidence of ISIL's activities in Libya. There was also evidence of ISIL's attacks in Egypt, and therefore this argument lacks merit.[5]

Welson further contends that the Board erred in concluding that he did not document a material policy change when he submitted a news article discussing the Trump administration's policy of giving preferential treatment to Christians seeking to enter the U.S. from majority-Muslim countries covered by the entry ban. But the Board correctly reasoned that this was not a "material change in policy which would affect [the Board's] previous decision" because the article did not discuss any change to the general asylum standards under which Welson's claim was previously denied.

Next, Welson takes issue with the BIA's statement in its first decision that the additional articles he submitted "generally reflect incidents of civil unrest and violence similar to those accounted for by the State Department reports cited by the Immigration Judge." Welson cites a host of out-of-circuit cases for the proposition that general civil strife does not preclude asylum relief, and then attempts to argue that the BIA denied his motion to remand solely on the basis that there were "incidents of civil unrest and violence" in Egypt. But that is clearly not what the BIA did. Rather, the BIA denied Welson's motion to remand because the articles he submitted described events "similar to those accounted for" by the materials before the IJ, not merely because the articles described general civil strife in Egypt. Accordingly, this argument fails.[6]

---

[5] Relatedly, Welson argues in his reply brief that we should review the BIA's denial of his motions to reopen de novo, rather than under the abuse-of-discretion standard, to the extent that he has presented a question of law. That question of law, he contends, is whether the BIA erred by equating evidence of ISIL's activities in Libya to evidence of ISIL's activities in Egypt. But for the reasons just discussed, even under de novo review this argument fails because Welson's factual premise—that there was no evidence of ISIL in Egypt before the IJ—is incorrect.

[6] In the heading of Part G of Welson's argument, his brief states that the BIA's third decision erred "in placing an additional requirement that the government of Egypt be complicit in the persecution of Christians." However, his brief does not elaborate at all on this point in the

Welson also challenges the BIA's second decision on the basis that it did not apply the correct standard for evaluating a motion to reopen. He points to the BIA's statement that "a party who seeks to reopen proceedings to pursue relief bears a 'heavy burden' of demonstrating that if the proceedings were reopened, the new evidence presented would likely change the result in the case" (quoting *Coelho*, 20 I. & N. Dec. at 473). He argues that this is the wrong standard because, to prevail on an asylum claim, an applicant need only show a well-founded fear of persecution, which the Supreme Court has described as requiring only a ten-percent likelihood of persecution. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 440 (1987). Welson argues that a "heavy burden" is incompatible with the ten-percent-chance standard defined in *Cardoza-Fonseca*, and therefore he claims that the BIA likely employed the higher standard for withholding of removal, which requires an applicant to demonstrate that persecution is more likely than not to occur. *See INS v. Stevic*, 467 U.S. 407, 424 (1984). We have already rejected this precise argument, made by the same attorneys, in *Reyna*:

> De La Cruz's remaining argument with respect to the absence of a prima facie asylum case is that the BIA applied the wrong standard. In this regard, De La Cruz argues that the BIA improperly applied a 51% burden of proof to De La Cruz's fear of persecution, rather than a 10% burden. This argument is without merit. The burden for a motion to reopen is a heavy one, and the movant must show "that if proceedings before the immigration judge were reopened . . . the new evidence offered would likely change the result of the case." *Matter of Coelho,* 20 I. & N. Dec. 464, 473 (BIA 1992). This is the burden that the BIA applied to De La Cruz's motion to reopen. De La Cruz's argument conflates the lower burden to be applied in an asylum determination—"a well-founded fear of persecution," 8 C.F.R. § 208.13(b)(2)—with the burden applied to a motion to reopen. In the context of a motion to reopen, De La Cruz had a heavy burden to show that the new evidence offered regarding his fear of persecution would likely change the result if the case were reopened before the IJ.

body of the argument. Therefore, this argument is forfeited. *See Russ v. Memphis Light Gas & Water Div.*, 720 F. App'x 229, 239 (6th Cir. 2017).

631 F. App'x at 371. This reasoning applies equally to Welson's argument and explains why it is without merit.

Finally, Welson contends that the BIA's third decision was flawed because, in setting out the standard of review for a time- or number-barred motion to reopen, the BIA stated that Welson had to "make a showing that he faces a threat of *individual* persecution." (Emphasis added.) To support this statement, the BIA cited our decision in *Harchenko v. INS*, in which we said:

> As we have previously noted, an alien filing a motion to reopen based on changed country conditions "cannot rely on speculative conclusions or mere assertions of fear of possible persecution, but instead must offer reasonably specific information showing a real threat of individual persecution." *Dokic v. INS*, No. 92-3592, 1993 WL 265166, \*5 (6th Cir. July 15, 1993) (citing *Blanco-Comarribas v. INS*, 830 F.2d 1039, 1041–42 (9th Cir. 1987)). "The feared persecution must relate to the alien individually, not to the population generally." *Id.*

379 F.3d 405, 410 (6th Cir. 2004). Welson argues that both the BIA's statement in this case and our decision in *Harchenko* misstate the law, and that they are inconsistent with precedent which holds that an alien may establish a well-founded fear of persecution based on what has happened to other similarly situated people in his native country. *See, e.g.*, *Perkovic v. INS*, 33 F.3d 615, 621 (6th Cir. 1994) (quoting *Matter of Mogharrabi*, 19 I. & N. Dec. 439, 446 (BIA 1987)). But Welson's argument is based on a misreading of *Harchenko*. *Harchenko* does not say that an alien cannot establish a well-founded fear of persecution by reference to the experiences of similarly situated persons. Rather, *Harchenko* says only that an alien must link the threat of persecution to the particular group of which the alien claims to be a member rather than the population at large; in other words, "[t]he feared persecution must relate to the alien individually, not to the population generally," *Harchenko*, 379 F.3d at 410 (quoting *Dokic*, 1993 WL 265166, at \*5). Thus, although Welson is correct to the extent he notes that an alien can demonstrate a well-founded fear of persecution by showing either (1) that he will be singled out individually for persecution, or (2) that

there is a pattern or practice of persecution against a group of which he is a member, *see* 8 CFR § 1208.13(b)(2)(iii), he is not correct in asserting that *Harchenko*, or the BIA's statement in this case based on *Harchenko*, is inconsistent with this proposition.[7]  Moreover, even if the BIA's statement had been erroneous, it was harmless.  The BIA denied Welson's motion to reopen not because he failed to show a threat of individual persecution, but rather because his new evidence indicated "a continuation of the strife and violence considered previously in this matter, rather than a material change in relevant country conditions."[8]

For these reasons, we deny Welson's petition for review.

---

[7] Welson also argues that, to the extent *Harchenko* and *Dokic* are inconsistent, we are bound to follow *Dokic* as the earlier precedent.  First, this argument is wrong because, as just explained, Welson misunderstands *Harchenko*, and that decision is consistent with *Dokic*.  But even if the two decisions were inconsistent, we would be bound to follow *Harchenko* and not *Dokic* because *Dokic* is an unpublished decision.  *See Thomas v. Eby*, 481 F.3d 434, 441 (6th Cir. 2007).

[8] For the first time in his reply brief, Welson argues that he was denied due process when the BIA stated in its third decision that "[m]illions of Coptic Christians (including [Welson's] family) continue to live in Egypt," because, in Welson's view, this shows that the BIA denied his motion to reopen based on "floodgate" concerns that all of those Coptic Christians would be eligible for asylum if Welson's application were granted.  This argument is forfeited because Welson failed to raise it in his opening brief.  *See Marks v. Newcourt Credit Grp., Inc.*, 342 F.3d 444, 462 (6th Cir. 2003).  Even if it were not forfeited, the argument would fail because that is obviously not what the BIA meant when it referred to the millions of Coptic Christians living in Egypt.